EXECUTONE INFORMATION SYSTEMS, INC., Plaintiff–Appellee, Cross–Appellant,

v.

Lloyd K. DAVIS, et al., Defendants–Appellants, Cross–Appellees.

No. 92–2555.

United States Court of Appeals, Fifth Circuit.

July 12, 1994.

Paul J. McConnell, III, Stephen C. Reid, III, Ben A. Baring, Jr., De Lange, Hudspeth & Pitman, Houston, TX, for appellant.

Michael J. Lockerby, Hunton & Williams, Richmond, VA, Jacks C. Nickens, Barbara A. Clark, Houston, TX, for appellee.

Before KING and JONES, Circuit Judges, and KAZEN,* District Judge.

KING, Circuit Judge:

The main issue on this appeal is whether the district court correctly enforced a decision rendered by an arbitrator.

## I. BACKGROUND

### A. NEGOTIATIONS

The plaintiff in this case is Executone Information Systems, Inc. ("Executone"). According to its original complaint, Executone is a Virginia corporation with its principal place of business in Connecticut. Executone is the manufacturer of communications products, including telephone equipment. At least at the time this dispute arose, Executone's practice was to market its products to other distributors.

Executone brought this action against Lloyd K. Davis, Edward H. White III, and High Technology Specialists, Inc. ("HTS"). These three parties (collectively referred to in this opinion as "the former Isoetec shareholders") are all former shareholders of Isoetec Texas, Inc. ("Isoetec"), a Texas corporation with its principal place of business in Texas. Executone alleged and the defendants admitted that Davis and White were Texas residents and HTS was a Delaware corporation with its principal place of business in Texas. According to Davis and White, HTS's interest in this suit has been transferred to Davis.

It appears that Isoetec was formed in 1985 for the purpose of serving as a Texas distributorship for Executone's products. At some point the parties began negotiations with a view to an eventual purchase of Isoetec by Executone. These negotiations culminated in the execution of a purchase agreement on June 5, 1989. Under the terms of the agreement, Executone agreed to purchase all of the stock or assets of Isoetec by January 1,

* District Judge of the Southern District of Texas, sitting by designation.

1990. The parties also entered into new distributor and marketing agreements on June 5, 1989. As part of the consideration for all of these agreements, Executone, Isoetec, and Isoetec's shareholders executed a broad release agreement whereby Executone released all claims or contracts that it might have against Isoetec and its shareholders, and Isoetec and its shareholders released their claims and contracts against Executone. The release is also dated June 5, 1989.

The purchase agreement required Isoetec to furnish Executone with Isoetec's unaudited balance sheets and all related financial statements for the period from January 1 through September 30, 1989, no later than October 31, 1989. The parties agreed that the purchase price would be calculated according to a formula based in part on a multiple of Isoetec's 1989 "adjusted pre-tax profits," if any, and that the purchase would be effective no later than January 1, 1990. They further agreed that an "interim closing" would occur no later than January 19, 1990, and that an interim purchase price would be calculated based upon Isoetec's unaudited financial statements for the purposes of that closing. However, calculation of the final purchase price was agreed to occur only after an audit and a subsequent review of that audit. Isoetec agreed to obtain an audit of its 1989 financial statements by the accounting firm of BDO Seidman and to make that audit available to Executone within twenty-one days of receipt. Executone agreed to obtain a review of the BDO Seidman audit from Arthur Andersen & Co. within twenty-one days of receiving that audit. The final purchase price was to be calculated based on the audit information, and the parties agreed to adjust any consideration paid under the interim purchase price to reflect the final purchase price. The parties also included the following clause in the purchase agreement:

> Any bona fide dispute over the 1989 Audit, GAAP as that term is defined in Exhibit D [to the purchase agreement], or regarding computation of the Isoetec Purchase Price pursuant to Exhibit B [to the purchase agreement] shall be subject to final resolution by Price Waterhouse within the 21

Day Period [following Executone's receipt of the BDO Seidman audit].

The time-table set forth in the purchase agreement was not strictly observed, although according to the former Isoetec shareholders, Executone did take over the operations of Isoetec on January 1, 1990. The interim closing of the purchase of Isoetec by Executone occurred on February 16, 1990. The interim purchase price established for the purposes of that closing was approximately $3,000,000, based on adjusted pre-tax profits for 1989 of $1,136,001. At the February 16 closing, Executone apparently issued some shares of Executone stock and a $1,000,000 promissory note, plus some cash and other convertible notes, to the Isoetec shareholders as required under the purchase agreement, and the Isoetec shareholders delivered their Isoetec stock to Executone. On or about April 1, 1990, Executone made a payment of $250,000 on the notes issued to the former Isoetec shareholders.

The BDO Seidman audit was slow in coming. In the interim, Arthur Andersen notified BDO Seidman in April 1990 of certain irregularities in Isoetec's preliminary financial statements. Executone claims that the BDO Seidman audit was finally made available to Executone on May 30, 1990. Under the BDO Seidman audit, the final purchase price was calculated to be approximately $2,900,000. All parties agree that Executone disputed BDO Seidman's conclusions. Davis contacted Executone's chief operating officer by letter dated June 7, 1990, advising Executone to engage Price Waterhouse and submit whatever disputed matters it wished. The letter concluded by pointing out that the twenty-one day period for such submission would expire on June 20, 1990. In Executone's responsive letter, it accused Isoetec of obstructing the Price Waterhouse arbitration and advised Isoetec that Executone would engage Price Waterhouse within the appropriate time period.

Price Waterhouse contacted both Davis and Executone by letter dated June 15, 1990, outlining the conditions under which it would arbitrate the dispute. Counsel for the former Isoetec shareholders contacted Executone and advised that some changes to Price

Waterhouse's engagement letter needed to be made. On June 18, 1990, Executone sent Price Waterhouse an executed copy of the engagement letter and a check as a retainer for the engagement.

The dispute, however, did not immediately go to arbitration. According to the former Isoetec shareholders, Executone did not pay the installment due on its promissory notes on July 1, 1990. On July 2, 1990, Executone filed suit in federal district court for the Southern District of Texas against Davis, White, and HTS ("the Isoetec defendants").

### B. LITIGATION AND ARBITRATION

Executone's suit against the Isoetec defendants contained six counts, including breach of contract, common law fraud, and violations of the securities laws of Texas and the United States. Requested relief included specific performance, damages, or rescission. Federal jurisdiction was predicated on both diversity of citizenship and federal question and pendent jurisdiction by virtue of the count based on federal securities law. The Isoetec defendants answered and counterclaimed, also alleging fraud and securities law violations.

In November 1990, Executone moved for partial summary judgment, asking the court to "find that the dispute is subject to final resolution by Price Waterhouse." The Isoetec defendants opposed this motion. The district court first sent the parties to non-binding mediation, then entered the following order: "It is hereby ORDERED that the parties in the above action submit all issues to Price Waterhouse for final resolution within thirty (30) days pursuant to the terms of their agreement."

We must examine the correspondence between the parties and Price Waterhouse (referred to hereinafter as "the arbitrator") in some detail. Executone submitted a number of issues challenging Isoetec's computations of its 1989 adjusted pre-tax profits on the basis of the accounting principles used by Isoetec. The arbitrator's resolution of these "accounting issues," as they have been styled by the parties, has not been directly challenged in this litigation, and indeed it ap-

pears that the document whereby Executone described and submitted these issues to the arbitrator has not even been included in the record. It is clear from the record, however, that one of the accounting issues concerned the so-called "Stewart Title transaction." It appears that Isoetec entered into a contract in March 1989 with Stewart Title Company ("Stewart Title") to provide Stewart Title with telephone equipment, and that Isoetec's 1989 financial statements included $295,000 in profits from this sale. According to the arbitrator's report, Stewart Title had the equipment removed some time after 1989, apparently because it was dissatisfied with the equipment. Executone thus contended that Isoetec should not be allowed to count the $295,000 profit from the Stewart Title transaction because subsequent to year end, Stewart Title exercised its contractual right to return the equipment.

The Isoetec shareholders submitted their own list of issues to the arbitrator (the "other issues"). These issues generally charged Executone with taking actions that decreased Isoetec's 1989 profits by varying amounts. For instance, the shareholders charged that Executone had breached the distributor agreement by overcharging Isoetec for Executone equipment, thereby reducing Isoetec's profits and causing Isoetec to lose several contracts in 1989. The Isoetec shareholders also claimed that Isoetec and Executone had agreed that Executone would bid on a telephone installation needed by the Dallas Independent School District, that Executone and Isoetec had agreed to share the profits, and that Executone had failed to bid on the contract as promised.

Two of the Isoetec shareholders' "other issues" concerned the Stewart Title transaction. We reprint those two issues as submitted in full:

3. *Loss of Stewart Title Dallas and Fort Worth systems due to equipment shortage and deficiencies.* As a result of the defective software provided to Stewart Title—Houston, Stewart Title—Dallas and Stewart Title—Fort Worth canceled the existing contracts with Isoetec Texas, Inc. for installations in their Dallas and Fort Worth offices. These installations

totalled $135,000.00, and the net profits after commissions would have been $38,000.00. Thus, 1989 profits should be increased by $38,000.00....

. . . .

5. *Additional costs on Stewart Title— Houston installation due to problems with Executone equipment.* As a result of problems experienced with equipment provided by Executone and as a result of problems with the software provided by Executone on the Stewart Title—Houston installation, Isoetec Texas, Inc. was forced to assign several additional people to the job. Isoetec Texas, Inc. also had additional system redesign costs and other additional labor and material costs on that job as a result of Executone's equipment problems, resulting in a total additional cost to Isoetec Texas, Inc. in 1989 (and thus a reduction of 1989 profits) in the amount of $110,000.00....

After receiving the parties' submissions and based on those submissions, the arbitrator contacted the parties by letter dated August 14, 1991, summarizing the arbitrator's understanding of Isoetec's "other issues." The letter stated:

I believe the hearing will be most efficient if the "other" issues are handled separately from the "accounting" issues. Our understanding is that the "other" issues include the following:

1. Alleged overcharges under the Distributor Agreement.
2. Alleged loss of contracts due to the alleged overcharges.
3. Alleged loss of contracts due to equipment shortages and deficiencies.
4. Potential loss due to alleged failure to bid on a D.I.S.D. contract.
5. Alleged loss due to employment of Mary Jo Green.
6. Alleged compromise of independence by BDO Seidman.
7. Alleged damages due to loss of asset purchase option.

The letter also advised the parties to bring supporting documentation relevant to each of the "other issues." With respect to the third issue, regarding loss of contracts, the arbitra-tor advised the parties to make available "[c]orrespondence regarding deficiencies and shortages" and "[e]xpert citations regarding equipment functionality or lack thereof." Counsel for the Isoetec shareholders sent the arbitrator a letter agreeing that the arbitrator's letter listed all of the "remaining issues other than the accounting issues"; we have found nothing in the record to indicate that Executone ever acknowledged or objected to the arbitrator's August 14, 1991, letter.

The arbitrator released separate reports regarding the "accounting issues" and "other issues" in October 1991. In its report regarding the accounting issues, the arbitrator ruled that the $295,000 claimed by Isoetec as profits from the Stewart Title transaction could not be included as adjusted pre-tax profits for purposes of the purchase price computation. The arbitrator also ruled that certain other deductions should be made. The deductions in 1989 adjusted pre-tax profits required by the arbitrator totalled over $400,000. Under the terms of the arbitrator's report regarding the accounting issues, the final purchase price of Isoetec should have been roughly $1,100,000—substantially less than the interim purchase price of some $3,000,000.

What the arbitrator gave Executone with one hand, however, it took away with the other. In its report regarding the "other issues," the arbitrator awarded $1,187,000 in damages to the former Isoetec shareholders, explaining that Executone had breached warranties with respect to the equipment involved in the Stewart Title transaction. Thus, the arbitrator awarded the former Isoetec shareholders damages "equivalent to the impact on the purchase price of not having [the Stewart Title transaction] completed under its terms." Because the arbitrator deemed Executone the prevailing party, it deducted $125,000 in costs and fees from this damages award, for a total damages award of $1,062,000.

Returning to court, both Executone and the Isoetec defendants moved for summary judgment. Executone requested the court, among other things, to ignore the arbitrator's award of damages to the former Isoetec

shareholders and to declare the final purchase price to be $1,093,921. The Isoetec defendants requested judgment in their favor in the amount of $2,573,567.27. This amount, of course, included the $1,062,000 damages award in favor of the former Isoetec shareholders and interest on that award.

The district court heard oral argument on the summary judgment motions on March 13, 1992. The court then directed the parties to file supplemental letter briefs addressing the scope of an arbitrator's authority and circumstances under which an arbitrator's decision can be set aside. On April 14, 1992, the district court entered an order denying Executone's motion for summary judgment and granting the Isoetec defendants' motion for summary judgment. In its final judgment, entered on June 23, 1992, the district court ordered that the arbitrator's award be adopted in all respects. The judgment further contained the following orders: (1) it awarded to the Isoetec defendants $1,187,000 with *no* prejudgment interest on such amount; (2) it directed that Executone should give the former Isoetec shareholders 383,399 new shares of Executone stock in exchange for the 246,619 shares previously issued; (3) it directed Executone to file a registration statement with the Securities and Exchange Commission (SEC) registering all shares of stock issued to the defendants; (4) it awarded Executone the $125,000 in fees awarded by the arbitrator and $48,579 (plus interest) as the amount that Executone had overpaid for Isoetec; and (5) it required former Isoetec shareholders who had owned stock appreciation rights in Isoetec and who had received Executone stock in exchange for those rights to surrender their Executone stock thereby received.

This appeal and cross-appeal followed.

## C. Issues on Appeal

The Isoetec defendants have been designated the appellants for purposes of this appeal. They raise several issues for our consideration. They contend that the district court erred in refusing to award them prejudgment interest from January 1, 1990, costs, and attorneys' fees. They also argue that the district court erred in ordering that

part of the arbitrator's award should be satisfied by requiring the former Isoetec shareholders to exchange the 246,619 shares of Executone stock that they had already received for 383,399 new shares of Executone stock. Finally, they attack . the district court's order that required the former shareholders of Isoetec to surrender to Executone the Executone stock received in exchange for their stock appreciation rights.

Executone argues in support of all of the district court rulings attacked by the Isoetec defendants. Additionally, as cross-appellant, Executone argues that the district court should have set aside the arbitrator's award of damages to the Isoetec shareholders for Executone's breach of warranty.

We note that the proceedings before the arbitrator were not transcribed and are not a part of the record on appeal.

## II. STANDARD OF REVIEW

 Our review of the district court's confirmation of an arbitrator's award is de novo. *Anderman/Smith Operating Co. v. Tennessee Gas Pipeline Co.*, 918 F.2d 1215, 1218 n. 2 (5th Cir.1990), *cert. denied,* 501 U.S. 1206, 111 S.Ct. 2799, 115 L.Ed.2d 972 (1991). Our review of the arbitrator's award itself, however, is very deferential. *Id.* at 1218. We must sustain an arbitration award even if we disagree with the arbitrator's interpretation of the underlying contract as long as the arbitrator's decision " 'draws its essence' " from the contract. *Id.* (quoting *United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 36, 108 S.Ct. 364, 369–70, 98 L.Ed.2d 286 (1987)); *see* 9 U.S.C. § 10(d) (permitting the district courts to vacate an arbitration award when "the arbitrators exceeded their powers"). In other words, we must affirm the arbitrator's decision if it is rationally inferable from the letter or the purpose of the underlying agreement. *Id.* (citing *Local Union 59, Int'l Bhd. of Elec. Workers v. Green Corp.*, 725 F.2d 264, 268 (5th Cir.), *cert. denied,* 469 U.S. 833, 105 S.Ct. 124, 83 L.Ed.2d 66 (1984)). In deciding whether the arbitrator exceeded its authority, we resolve all doubts in favor of arbitration. *Valentine Sugars, Inc. v. Donau Corp.,*

981 F.2d 210, 213 (5th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 3039, 125 L.Ed.2d 725 (1993).

## III. ANALYSIS

### A. EXECUTONE'S CROSS-APPEAL

Executone contends that we should reverse the district court's adoption of the portion of the arbitrator's decision awarding the former shareholders of Isoetec damages of $1,187,000. The first prong of Executone's two-pronged attack is that the issue on which the award was based was not actually submitted for arbitration. Second, Executone argues that the award does not draw its essence from the parties' agreements.

### 1. *Was the Matter "Submitted" to the Arbitrator?*

■ In Executone's view, the arbitrator's award of damages to the former Isoetec shareholders must be modified and corrected because it was awarded "upon a matter not submitted" to the arbitrator. Title 9 of the United States Code authorizes the district courts to modify or correct an arbitration award "[w]here the arbitrators have awarded upon a matter not submitted to them," 9 U.S.C. § 11(b); *see also Totem Marine Tug & Barge, Inc. v. North Am. Towing, Inc.,* 607 F.2d 649, 651 (5th Cir.1979) ("Although arbitrators enjoy a broad grant of authority to fashion remedies ..., arbitrators are restricted to those issues submitted."). The former Isoetec shareholders contend that we should defer to the arbitrator's interpretation of the issue submitted to it for decision just as we defer to the arbitrator's interpretation of the contract.

■ We begin by noting that the question of whether a party can be compelled to arbitrate, as well as the question of what issues a party can be compelled to arbitrate, is an issue for the court rather than the arbitrator to decide. *Litton Fin. Printing Div. v. NLRB,* 501 U.S. 190, 207–09, 111 S.Ct. 2215,

2226, 115 L.Ed.2d 177 (1991); *AT & T Technologies, Inc. v. Communications Workers,* 475 U.S. 643, 649, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986); *see also Neal v. Hardee's Food Sys., Inc.,* 918 F.2d 34, 37 (5th Cir.1990) (reviewing the arbitrability question de novo); *District 37 of Int'l Ass'n of Machinist & Aerospace Workers v. Lockheed Eng'g & Mgmt. Servs. Co.,* 897 F.2d 768, 770 (5th Cir.1990) ("[T]he arbitrability of a grievance is an issue for judicial determination."). Doubts are to be resolved in favor of arbitrability. *AT & T,* 475 U.S. at 650, 106 S.Ct. at 1419.

Executone focuses on the letters sent to the arbitrator by the parties, contending the three matters related to the Stewart Title transaction were submitted to the arbitrator as follows: (1) should the final Isoetec purchase price reflect a $295,000 profit in 1989 from the Stewart Title transaction, (2) were the former shareholders of Isoetec entitled to a $110,000 credit for additional labor and material costs incurred by Isoetec in connection with the Stewart Title transaction, and (3) were the former shareholders of Isoetec entitled to a $38,000 credit for profits lost when Stewart Title canceled its Dallas and Fort Worth contracts with Isoetec. Executone also contends that the arbitrator answered all three issues "no," in favor of Executone's position. However, the arbitrator allocated the fault for the $295,000 lost profit to Executone, and it awarded the former Isoetec shareholders in damages the amount that they lost in terms of the final purchase price based on a breach of warranty theory. In Executone's view, the arbitrator effectively awarded the former Isoetec shareholders some eight times the $148,000 they had requested.

After a careful review of the record, we conclude that the issue decided by the arbitrator in favor of the former Isoetec shareholders with respect to the Stewart Title transaction was sufficiently submitted by the parties.[1] The arbitrator itself plainly be-

---

1. We take note of the view expressed by our sister circuits that the arbitrator's interpretation of the scope of the issues submitted to him is entitled to the same judicial deference accorded his interpretation of the agreement being arbi-

trated, *El Dorado Technical Servs., Inc. v. Union General de Trabajadores,* 961 F.2d 317, 321 (1st Cir.1992); *Pack Concrete, Inc. v. Cunningham,* 866 F.2d 283, 285 (9th Cir.1989), but find it

lieved that the Stewart Title issue submitted for resolution was sufficiently broad in scope to justify the award. Soon after the arbitrator released its report regarding the "other issues" to the parties, counsel for Executone wrote a letter to the arbitrator strongly objecting to the Stewart Title damage award, asserting that Executone "never had an opportunity to respond to [the Stewart Title] claim because the former shareholders of Isoetec never requested the relief you awarded." The arbitrator responded in a letter, defending its conclusion that the parties had submitted the issue decided. That letter read, in pertinent part:

> As previously stated, we disagree with your statement that EXECUTONE never had an opportunity to respond to the Stewart Title—Houston issue. My August 14, 1991, letter to EXECUTONE and Isoetec, which outlined the anticipated agenda for the evidentiary hearing, clearly listed "Alleged loss of contracts due to equipment shortages and deficiencies" as a "non-accounting" dispute. Further, Isoetec in the last paragraph of page four of its response to matters submitted by EXECUTONE states "because EXECUTONE delayed in delivering the additional hardware and software, Stewart [Title] removed the system." This allegation was further discussed at considerable length at the evidentiary hearing held in our Dallas office on September 13, 1991, and we believe EXECUTONE had every opportunity to address this issue.

We note that the August 14, 1991, letter from the arbitrator to the parties effectively served as a submission agreement when it was accepted by the parties without objection.

■ Admittedly, an issue concerning "Alleged loss of contracts due to equipment shortages and deficiencies" is somewhat broad, but this does not weaken our conclusion that the issue decided was submitted to the arbitrator. The *Valentine Sugars* case is instructive. The parties in that case had entered a joint venture whereby one party would provide a formula for a resin to be used to manufacture waferboard and the oth-

er would buy an industrial spray dryer to spray dry the liquid resin. *Valentine Sugars*, 981 F.2d at 211–12. The resin turned out to be faulty, so the joint venture was unsuccessful. *Id.* at 212. In the aftermath, one party sued the other and the dispute went to arbitration. *Id.* The demand for arbitration simply requested the panel to arbitrate " 'a dispute concerning a commercial matter involving several contracts signed on the 29th day of June, 1984. . . . ' " *Id.* at 213. The arbitrators decided in their award which party owned the spray dryer, the district court confirmed the award, and on appeal Valentine Sugars claimed that the issue of ownership of the spray dryer had not been submitted. *Id.* We affirmed the confirmation of the award, expressing our sympathy with Valentine but concluding that the broad language of the arbitration demand "gave the arbitrators the power to do whatever was necessary to resolve any disputed matter arising out of the joint venture." *Id.* As we observed, federal law does not impose any requirements as to how specific a notice of arbitration must be, and we declined to develop a code of pleading for arbitration ourselves. *Id.*

We distinguish *Totem,* a case relied upon heavily by Executone, in which we reversed an arbitrator's award because the arbitrator both improperly expanded the subject matter of the arbitration and improperly engaged in ex parte communications with one of the parties. *Totem,* 607 F.2d at 653. In the arbitration at issue in *Totem,* the party that ultimately prevailed claimed several items of damages totalling some $87,000, with the largest single item claimed being $45,000. *Id.* at 651. The arbitration panel, however, awarded the prevailing party some $158,000, including a $117,000 item of damages that the prevailing party had not even requested. *Id.* We vacated the award, noting that it is "anomalous for the arbitration panel to award an unrequested item of damages three times larger than any item claimed," *id.,* and concluding that the arbitrators had ignored the dispute actually submitted to them and dispensed "their 'own brand of industrial justice,' " *id.* at 652 (citation omitted).

unnecessary to adopt or reject that view given the clear facts of this case.

For the reasons outlined above we do not agree with Executone's contention that the arbitrator in the instant case, like the arbitration panel in *Totem*, decided an unsubmitted issue. Executone's focus on the two "other issues" related to the Stewart Title transaction as described by the former Isoetec shareholders' letter to the arbitrator, rather than on the arbitrator's summary of the issues to be decided, is misplaced. Additionally, we disagree with a key assumption underlying Executone's argument based on *Totem*, which is that the instant case also involves an arbitration award far in excess of the amount actually sought by the aggrieved party. Executone's assertion that the shareholders received some eight times the $148,000 in damages they requested with respect to the Stewart Title transaction is disingenuous. The shareholders sought a $148,000 adjustment in the calculation of Isoetec's 1989 pre-tax profits, not $148,000 in damages; application of the multiplier called for in the purchase agreement would have had a substantial inflationary effect on the actual award had the shareholders prevailed. Thus, Executone's argument that the $1,187,000 award to the shareholders was eight times the amount sought by them is fallacious. Additionally, Executone ignores the financial stakes represented by the Stewart Title accounting issue, which was whether Isoetec was entitled to record $295,000 in 1989 profits from the Stewart Title transaction. Had the arbitrator resolved this issue against Executone, the arbitration award in favor of the former Isoetec shareholders would closely resemble the actual award. It is clear to us that the arbitrator's award was, in terms of size, well within the parameters envisioned by the parties.

 The same facts that support our conclusion that the Stewart Title issue decided by the arbitrator was actually submitted also support the conclusion that the issue was arbitrable. It is well-settled that the arbitrator's jurisdiction is defined by both the contract containing the arbitration clause and the submission agreement. *Piggly Wiggly Operators' Warehouse, Inc. v. Piggly Wiggly Operators' Warehouse Indep. Truck Drivers Union, Local No. 1*, 611 F.2d 580, 583–84 (5th Cir.1980). If the parties go beyond their promise to arbitrate and actually submit an issue to the arbitrator, we look both to the contract *and* to the scope of the submissions to the arbitrator to determine the arbitrator's authority. *Id.* at 584; *see also United Food and Commercial Workers, Local Union No. 7R v. Safeway Stores, Inc.*, 889 F.2d 940, 946 (10th Cir.1989); *Sun Ship, Inc. v. Matson Navig. Co.*, 785 F.2d 59, 62 (3d Cir.1986). Thus, the parties may agree to arbitration of disputes that they were not contractually compelled to submit to arbitration. *Dorado Beach Hotel Corp. v. Union de Trabajadores de la Industria Gastronomica de Puerto Rico Local 610*, 959 F.2d 2, 4 (1st Cir.1992); *Piggly Wiggly*, 611 F.2d at 584. As we have already concluded, the parties agreed to allow the arbitrator to decide the issue of "Alleged loss of contracts due to equipment shortages and deficiencies." Because the parties agreed to submission of this broad issue to the arbitrator, it is irrelevant to our decision whether Executone might have properly objected to submission of the issue on the grounds of non-arbitrability. *Piggly Wiggly*, 611 F.2d at 584–85.

In summary, the district court ordered the parties to submit *all issues* to the arbitrator for final resolution. Before the arbitration commenced, the arbitrator sent the parties a summary of the issues it would decide and advised the parties that one of the issues to be arbitrated was Isoetec's alleged loss of contracts due to deficiencies in Executone's equipment. Executone has cited nothing in the record to show that it responded to the summary in any way to disabuse the arbitrator of its view of the issues to be decided. The arbitrator's notice was broad enough to include the issue of the "loss" of the Stewart Title—Houston contract due to faulty equipment and software. Although we are not free from doubt regarding the arbitrator's interpretation of the scope of its mandate, "we resolve all doubts in favor of arbitration." *Valentine Sugars*, 981 F.2d at 213. We conclude that the issue decided by the arbitrator was sufficiently submitted by the parties and therefore decline to reverse the arbitrator's interpretation of the scope of the Stewart Title issue.

### 2. Did the Award "Draw Its Essence" From the Parties' Contract?

The other strand of Executone's argument that we should reverse the arbitrator's award is the contention that the award does not "draw its essence" from the contracts between the parties. Before analyzing this claim it is worth quoting in full the rationale given by the arbitrator for the award of $1,187,000 in damages to the former Isoetec shareholders:

Issue 3 *Alleged loss of contracts due to equipment deficiencies*

*Dispute Resolver's decision*—Damages are awarded to the former shareholders of Isoetec in the amount of $1,187,000.

*Rationale*—The claim is a breach of warranty claim related to the functionality of the hardware and software provided by EXECUTONE. Section 7(A) of the Distributor Agreement addresses the warranties of EXECUTONE. Section 7(A) states "EXECUTONE's obligation under this warranty shall be limited to repair or replace any part(s) or Software which may prove defective under normal and proper use and service for the Warranty Period. [ ]EXECUTONE shall not be responsible for any labor costs incurred by Distributor during the Warranty Period." Section 7(A) further states "IN NO EVENT SHALL EXECUTONE BE LIABLE FOR SPECIAL OR CONSEQUENTIAL DAMAGES ..." The testimony and supporting documents produced at the September 13, 1991 evidentiary hearing support[ ] a finding that the hardware and/or software did not function properly and that EXECUTONE approved the design of the system prior to installation; therefore, Isoetec has a valid breach of warranty claim. The testimony further supports a finding that the equipment would still be in use but for the functionality problems. The damage amount therefore is equivalent to the impact on the purchase price of not having this sale completed under its terms. Additional lost profits and labor costs are not recoverable under this claim.

In its letter to Executone's counsel after the award had been made, the arbitrator offered the following additional explanation:

[T]he damage amount of $1,187,000 in our report is the calculated result under the Purchase Agreement of the $295,000 reduction in income related to the Stewart Title—Houston contract, and represents the economic damage to Isoetec of EXECUTONE's actions; it does not represent lost profits or damages under the Distributor Agreement. The calculation of this amount is based upon the provisions of the Purchase Agreement. We believe this damage calculation is appropriate for the following reasons: 1) the Purchase Agreement was the agreement under which this dispute resolution process arose, and 2) the special nature of the environment which the Purchase Agreement created causes certain actions taken by the parties to the Agreement to have an economic impact beyond that which would have existed outside this environment.

Executone contends that the award does not "draw its essence" from the parties' contracts and that we must therefore vacate the arbitrator's award of damages.

#### a. The "Essence" Test

We first turn to the case law to flesh out our standard of review, the rather metaphysical "essence" test. The test dates back to the Supreme Court's decision in *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960), in which the Court stated that an arbitrator's award "is legitimate only so long as it draws its essence from the collective bargaining agreement." *See also United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38, 108 S.Ct. 364, 370–71, 98 L.Ed.2d 286 (1987) ("[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision."). As might be expected, the cases applying *Enterprise Wheel* have arisen largely in the labor relations context, in which arbitration is prevalent, but we have also applied the "essence" test in other cases involving the review of arbitration awards. *E.g., Anderman/Smith,* 918 F.2d at 1216–17; *Totem,* 607 F.2d at 650.

A leading case from this circuit applying the "essence" test is *Brotherhood of R.R. Trainmen v. Central of Ga. Ry.*, 415 F.2d 403, 412 (5th Cir.1969), *cert. denied*, 396 U.S. 1008, 90 S.Ct. 564, 24 L.Ed.2d 500 (1970), in which we stated that an arbitration award "must have a basis that is at least rationally inferable, if not obviously drawn, from the letter or purpose of the collective bargaining agreement.... [T]he award must, in some logical way, be derived from the wording or purpose of the contract." Phrased another way, the question is whether the arbitrator's award "was so unfounded in reason and fact, so unconnected with the wording and purpose of the collective bargaining agreement as to 'manifest an infidelity to the obligation of an arbitrator.'" *Id.* at 415 (quoting *Enterprise Wheel*, 363 U.S. at 597, 80 S.Ct. at 1361). We also indicated that the arbitrator's selection of a particular remedy is given even more deference than his reading of the underlying contract, stating that the remedy lies beyond the arbitrator's jurisdiction only if "there is no rational way to explain the remedy handed down by the arbitrator as a logical means of furthering the aims of the contract." *Id.* at 412. In making our "essence" inquiry, we are not limited to the arbitrator's explanations for his award; as we stated in *Anderman/Smith,*

> this Court does not review the language used by, or the reasoning of, the arbitrators in determining whether their award draws its essence from the contract. This Court looks only to the result reached. The single question is whether the award, however arrived at, is rationally inferable from the contract.

918 F.2d at 1219 n. 3.

Given our expansive reading of the "essence" test, it is not surprising that we have frequently upheld arbitration awards against challenges on this ground. For instance, we have upheld an arbitrator's award of back pay despite the fact that the underlying collective bargaining agreement neither permitted nor precluded such a remedy. *Minute Maid Co. v. Citrus Workers, Local 444,* 331 F.2d 280, 281 (5th Cir.1964). In *Amalgamated Meat Cutters of N. Am., Dist. Local No. 540 v. Neuhoff Bros. Packers, Inc.,* 481 F.2d

817, 819 (5th Cir.1973), we enforced an arbitrator's award reinstating employees accused of theft and held that it was permissible for the arbitrator to require the employer to prove the employees guilty beyond a reasonable doubt. In *United Steelworkers of Am. v. United States Gypsum Co.,* 492 F.2d 713, 728–32 (5th Cir.), *cert. denied,* 419 U.S. 998, 95 S.Ct. 312, 42 L.Ed.2d 271 (1974), we enforced an arbitrator's award, agreeing that it was within the arbitrator's power to find that an employer had breached a promise to negotiate a wage increase and to award the employees what the arbitrator believed would have been gained through negotiations.

These cases may be contrasted with those in which we have vacated arbitration awards. We have held that an arbitrator may not invalidate the very agreement from which he derives his power. *International Ladies' Garment Workers' Union v. Ashland Indus., Inc.,* 488 F.2d 641, 643–44 (5th Cir.), *cert. denied,* 419 U.S. 840, 95 S.Ct. 71, 42 L.Ed.2d 68 (1974). We have also held that "arbitral action contrary to express contractual provisions will not be respected" on judicial review. *Delta Queen Steamboat Co. v. District 2 Marine Eng'rs Beneficial Ass'n,* 889 F.2d 599, 604 (5th Cir.1989), *cert. denied,* 498 U.S. 853, 111 S.Ct. 148, 112 L.Ed.2d 114 (1990); *see also Misco,* 484 U.S. at 38, 108 S.Ct. at 370–71 ("The arbitrator may not ignore the plain language of the contract...."). Thus, if a collective bargaining agreement permits an employer to discharge an employee for "proper cause," and the arbitrator expressly or implicitly finds that proper cause existed, we will vacate the arbitrator's inconsistent reinstatement award. *Delta Queen,* 889 F.2d at 604; *Container Prods., Inc. v. United Steelworkers of Am., Local 5651,* 873 F.2d 818, 819–20 (5th Cir.1989).

### b. The Particulars of the Purchase Agreement

Having determined that we must uphold the arbitrator's award if the arbitrator's award was drawn "from the letter or the purpose" of the underlying contract, *Brotherhood of R.R. Trainmen,* 415 F.2d at 412, we turn to the particulars of the Executone–

Isoetec purchase agreement. As we have already seen, the parties agreed in mid–1989 that Executone would buy either all of Isoetec's stock or all of Isoetec's assets at the beginning of 1990. The parties further agreed that the purchase price to be paid by Executone would be based on Isoetec's adjusted pre-tax profits for 1989. To ensure that Isoetec's 1989 records accurately reflected its profits for the year, the parties agreed that Isoetec would procure an audit from BDO Seidman and Executone would provide for a subsequent review from Arthur Andersen. From this, it is clear that a predominate purpose of the parties in drafting the purchase agreement was to make sure that the Isoetec purchase price fairly reflected Isoetec's 1989 profits. Indeed, Isoetec specifically agreed to operate normally during 1989 "and not manage the business simply to artificially increase 1989 earnings." In sum, the parties agreed to accept a purchase price for Isoetec based on a "snapshot" view of Isoetec's 1989 earnings, and specifically of Isoetec's 1989 adjusted pre-tax profits, as of December 31, 1989.[2]

Although the parties contemplated that the audit and review process would extend into 1990, they also contemplated that the change of ownership of Isoetec would occur no later than January 1, 1990. The purchase agreement states, "The Isoetec Purchase shall be effective, at Executone's option, as of either September 30, 1989 or January 1, 1990." In transactions of this kind, it is typical for the buyer to take over the operations of the purchased company immediately or shortly after the closing balance sheet date, even though the preparation of the year-end financial statements and the audit are still in progress and the calculation of the final purchase price cannot yet be done. Under generally accepted accounting principles, however, events occurring subsequent to the end of the relevant year can have a substantial impact on a company's profitability for that year; the failure subsequent to year end of a sale apparently completed during the year is just one example of this kind of event. Frequently, if not inevitably, the buyer is presented with opportunities to depress the purchase price by conducting the business of the acquired company in such a way as to diminish the company's profitability for the previous year.

This situation may well have occurred in the instant case. We know from the arbitrator that the Stewart Title—Houston transaction, scheduled for completion, and considered by the Isoetec shareholders and their auditor to have been completed, during 1989, was rescinded by Stewart Title after the end of 1989. Indeed, the arbitrator's resolution of the accounting issues reflects that the return of the equipment by Stewart Title after year end was the cause of the accounting adjustment to Isoetec's pre-tax profits for 1989 that eliminated the $295,000 in profits from the Stewart Title transaction that had been recorded by Isoetec and approved by Isoetec's auditor.[3] We do not know (be-

---

2. The purchase agreement provided, in part, as follows:

 An interim Isoetec Purchase Price will be computed in accordance with the provisions of Exhibit B [to the purchase agreement] on the basis of unaudited financial statements of Isoetec Texas as of and for the year ending December 31, 1989 ..., for the purpose of the Closing. Within 21 days of receipt by Executone of BDO Seidman's audit of the financial statements of Isoetec Texas as of and for the year ending December 31, 1989 ("the 1989 Audit") ..., a final Isoetec Purchase Price will be computed....

3. The arbitrator's report on the accounting issues gave the following rationale for disallowing the $295,000 profit from the Stewart Title transaction:

 *Dispute Resolver's decision*—A decrease in income before income tax expense and extraordinary item by $295,000 is to be recognized. *Rationale*—The Dispute Resolver believes that the right of return does not preclude the recognition of a sale when all of the requirements of FAS No. 48 are met. However, the removal of the equipment by Stewart Title subsequent to year end evidenced that revenue recognition was not appropriate during the year ended December 31, 1989. In this case, the amount of future returns could be reasonably estimated based on facts which arose subsequent to year end but before the issuance of financial statements.
 The Delivery and Installation Certificate dated September 29, 1989 made the ultimate sale contingent upon the completion of additional phases in accordance with definitive timetables. Due to the passage of time (the inventory still has not been returned), the inventory

cause the testimony before the arbitrator was not transcribed) what actions, if any, Executone, as the manager of the business after 1989, took to resist that rescission or to remedy the problems perceived by Stewart Title. We do know that the dynamics of the purchase agreement could well have provided Executone with an incentive not to resist the rescission and thereby to reduce Isoetec's profitability in 1989 in order to reduce the final Isoetec purchase price. The purchase agreement contains no provision that would allow Executone to operate Isoetec after 1989 in such a way as to manipulate the purchase price adversely to the interests of the former Isoetec shareholders (nor would we expect the former Isoetec shareholders to agree to such a provision), nor does the purchase agreement contain any provision precluding those shareholders from recovering in the event that any such manipulation took place.

Further, under the peculiar circumstances of this case, Executone in its capacity as the purchaser of Isoetec's business also had the opportunity *before* the close of 1989 to manipulate the purchase price of the Isoetec business adversely to the interests of the Isoetec shareholders. Through 1989 Executone continued to perform as Isoetec's supplier of equipment. We know from the arbitrator's report on the accounting issues, *see supra* note 3, that in September 1989 (which was four months after the date originally scheduled for completion of Isoetec's contract with Stewart Title), Isoetec and Stewart Title agreed upon a timetable for correction of the deficiencies that Stewart Title perceived in the Executone equipment delivered by Isoetec under that contract. We also know that the Isoetec shareholders' response to Executone's submitted issues alleged that Stewart Title ultimately removed the system "because EXECUTONE delayed in delivering[ ] additional hardware and software." From these two pieces of information in the record, it is clearly possible that the arbitrator concluded that Executone in its capacity as purchaser of the Isoetec business delayed during late 1989 in delivering the hardware and

software necessary for Isoetec successfully to complete the Stewart Title contract, thereby reducing the amount that Executone would be required to pay for Isoetec's business. Again, the purchase agreement contained no provision that would allow Executone to delay supplying Isoetec with the necessary hardware and software to complete the Stewart Title contract so as to manipulate the purchase price adversely to the interests of the Isoetec shareholders, nor does that agreement preclude the shareholders from recovering in the event that any such manipulation took place.

### c. Application of the "Essence" Test

▮ We now turn to the arbitrator's award of damages to the former Isoetec shareholders to see if its essence is rationally inferable from the letter or purpose of the agreement described in the preceding section. The arbitrator first explained that the damages award was based on a "breach of warranty" by Executone, a rationale that Executone attacks as contrary to the disclaimers and limited warranties made by Executone in the distributor agreement. In its subsequent letter to Executone, the arbitrator explained that the award of damages had been made under the purchase agreement, not under the distributor agreement, and that the "special nature of the environment" created by the purchase agreement contributed to the arbitrator's decision. Taking the arbitrator's awards and explanations as a whole, it appears that the arbitrator believed (1) that as a matter of generally accepted accounting principles, the Isoetec shareholders were not entitled to record the sale to Stewart Title as 1989 earnings in view of the fact that the sale effectively washed out after the end of 1989 while the audit was in progress, but (2) that furthering the intent of the parties as expressed in the purchase agreement required Executone to bear the post-December 31, 1989 loss of the Stewart Title sale because Executone, in its capacity as the purchaser of Isoetec's business, was responsible for that loss.

should be valued in accordance with Exhibit D of the Agreement which requires that used

inventory be valued at 25% of cost.

We conclude that the arbitrator's award did draw its essence from the purchase agreement executed by Executone, Isoetec, and the Isoetec shareholders because it is rationally inferable from the parties' central purpose in drafting the agreement—which was to reach a purchase price based on a fair calculation of Isoetec's adjusted pre-tax profits for the year ended on December 31, 1989—and because the award is not contrary to express terms of the parties' agreement. Executone contends that the award is contrary to releases executed by the parties and to its disclaimers and limited warranties made in the distributor agreement. We find each of these contentions insufficient to justify overturning the arbitrator's award.

■ First, Executone relies on a release agreement executed by the parties and attached to the purchase agreement as Exhibit A. In this document, Isoetec and its shareholders executed a broad release of Executone from liability "by reason of any matter, cause, information, or thing whatsoever from the beginning of the world to the Effective Date of this Release [June 5, 1989]." Executone argues that this release shields Executone from any liability for damages arising out of the Stewart Title transaction because the contract of sale between Stewart Title and Isoetec had already been executed (in March 1989) when the release was executed. The former Isoetec shareholders respond that this release was executed long before the critical events leading to the Stewart Title dispute occurred and so could not have encompassed damages arising out of those events. They also contend that Executone unsuccessfully presented this argument to the arbitrator, although we of course cannot verify this because we have no transcription of the arbitration proceedings. Executone also relies on similar releases executed by Isoetec's shareholders individually in early 1990 as barring the arbitrator's award.

The argument based on the individual releases executed by the Isoetec shareholders can be easily disposed of; those releases do *not* release claims arising out of the purchase agreement, and the arbitrator could certainly have rationally concluded that this claim arose out of that agreement. Nor do we believe that the release incorporated into the purchase agreement itself was so crystalline as to bar the damages award made by the arbitrator. The arbitrator may well have interpreted the release agreement not to apply to disputes (such as the Stewart Title dispute) arising out of events occurring predominately after the execution of the release. Even if this is a case in which the arbitrator may have read the contract differently than we would have read it—a conclusion we could not reach in the absence of a clear picture of the facts presented to the arbitrator—we cannot say that the arbitrator ignored plain contractual language en route to its final decision. *See Misco,* 484 U.S. at 38, 108 S.Ct. at 370–71 ("The arbitrator may not ignore the plain language of the contract; but the parties having authorized the arbitrator to give meaning to the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract."). The cases cited by Executone concerning an arbitrator's lack of authority to contravene a settlement reached by an employer and an aggrieved employee *after* a dispute has arisen but prior to arbitration, *Ohio Edison Co. v. Ohio Edison Joint Council,* 947 F.2d 786 (6th Cir.1991), and *Northwest Airlines, Inc. v. International Ass'n of Machinists, Air Transp. Dist. Lodge # 143,* 894 F.2d 998 (8th Cir.1990), are not on point.

■ Executone also contends that the arbitrator ran afoul of the express disclaimers of liability and limitations of warranty included by Executone in the distributor agreement. In that agreement, Executone made certain warranties with respect to the products, spare parts, and software that it was to supply to Isoetec under the distributor agreement and limited its obligation under the warranties "to repair or replace" defective parts or software. Executone also excluded all other warranties, express or implied.

Based on the limited record before us, we must conclude that the arbitrator was "arguably construing or applying the contract[s]," *Misco,* 484 U.S. at 38, 108 S.Ct. at 370–71, when it made its award, despite the limited warranties made by Executone. In the first

place, as the arbitrator observed, the limited warranties were made by Executone in the distributor agreement rather than in the purchase agreement. We have already seen that the purchase agreement could have changed the dynamics of the Executone–Isoetec relationship and ended their coinciding interests in seeing Isoetec perform profitably in 1989. The arbitrator may have reasonably concluded that the limitations of liability dictated by Executone should not be given the same strict interpretation in the new environment created by the purchase agreement as it would in a normal supplier-distributor situation. Although the purchase agreement admittedly did not include a covenant by Executone not to take actions solely for the purpose of deflating the Isoetec purchase price—the contract is silent on that point—the arbitrator could reasonably have interpreted the contract *not* to allow overreaching by Executone in the absence of a clause whereby the owners of Isoetec expressly agreed to run such a risk. That the arbitrator refused to read a standard "repair and replace" limited warranty in a distributor agreement as such an extreme cession of rights by the Isoetec shareholders under the purchase agreement is hardly surprising. Additionally, factual bases may have emerged during the course of the arbitration for overriding the limited warranties. *See* TEX.BUS. & COM.CODE ANN. § 2.719(b) (Tex. UCC) (Vernon 1968) ("Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this title.").

We conclude that the arbitrator's award did not contradict express contractual terms. Our inability to hold that the arbitrator undoubtedly exceeded its authority requires us to resolve our doubt in favor of the arbitration. *Valentine Sugars,* 981 F.2d at 213. Indeed, it appears to us that the arbitrator was faithful to the central purpose of the purchase agreement, which was to provide to the Isoetec shareholders a fair purchase price for the Isoetec business. Certainly, at a minimum, the award was rationally inferable from the parties' agreements.

We AFFIRM the district court's confirmation of the arbitration award.

## B. THE APPEAL BY THE FORMER SHAREHOLDERS OF ISOETEC

The former shareholders of Isoetec raise several issues for our consideration.

### 1. *Prejudgment Interest and Costs*

First, the former shareholders of Isoetec argue that the district court erred in denying them recovery of costs and prejudgment interest on the amount awarded to them by the arbitrator. According to the former shareholders, Texas law has long recognized that prevailing parties are entitled to recover prejudgment interest as a matter of law. In their view, they received a net judgment for some $1,925,000 despite Executone's contention that it owed nothing to the former shareholders. They seek interest at the Texas prejudgment interest rate of 10%, accruing from January 1, 1990, the date Executone was to have purchased Isoetec. In response, Executone relies on the arbitrator's conclusion that Executone was the prevailing party and claims that the district court enjoys broad discretion in deciding whether prejudgment interest is appropriate.

 Texas law governs the award of prejudgment interest on the arbitrator's award. *See Schlobohm v. Pepperidge Farm, Inc.,* 806 F.2d 578, 583–84 (5th Cir.1986) (applying Texas law in reviewing a district court's award of prejudgment interest on an arbitration award); *see also Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 25 n. 32, 103 S.Ct. 927, 941–42 n. 32, 74 L.Ed.2d 765 (1983) (noting that the Arbitration Act "creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate, yet it does not create any independent federal-question jurisdiction"); *Northrop Corp. v. Triad Int'l Marketing S.A.,* 842 F.2d 1154, 1155 (9th Cir.1988) (applying state law "to the determination of prejudgment interest in a diversity suit under the Federal Arbitration Act"). Under Texas law, prevailing parties receive prejudgment interest as a matter of course. *Richter, S.A. v. Bank of Am. Nat'l Trust and Sav. Ass'n,* 939 F.2d 1176, 1197 (5th Cir.1991). An arbitration award bears interest in the same manner as a judg-

**1330**

ment of a court of last resort in Texas. *Kermacy v. First Unitarian Church,* 361 S.W.2d 734, 735–36 (Tex.Civ.App.—Austin 1962, writ ref'd n.r.e.).

▪ We find nothing in the cases to suggest that prejudgment interest is appropriately awarded only to parties who prevail to the full extent of the relief they have sought. The award of prejudgment interest is "based on the equitable grounds that an injured party should be made whole." *Matthews v. DeSoto,* 721 S.W.2d 286, 287 (Tex.1986). This policy is advanced by awarding prejudgment interest to a party who has received part of the relief he has sought no less than by making the award in cases in which the party prevails completely. Thus, the arbitrator's statement that Executone was the prevailing party should have no bearing on the prejudgment interest question. This is the approach we implicitly took in *Schlobohm,* in which we affirmed an award of prejudgment interest to a party who received an arbitration award of roughly half the amount he requested. *Schlobohm,* 806 F.2d at 579, 583–84.

▪ Executone argues that it was within the district court's discretion to refuse to award prejudgment interest to the former Isoetec shareholders. The Texas Supreme Court has made clear that the award of prejudgment interest, although equitable in nature, is not generally a matter for the trial court's discretion. *Matthews,* 721 S.W.2d at 287; see also *Concorde Limousines, Inc. v. Moloney Coachbuilders, Inc.,* 835 F.2d 541, 549 (5th Cir.1987) ("We read *Cavnar [v. Quality Control Parking, Inc.,* 696 S.W.2d 549 (Tex.1985),] and *Matthews* as creating a regime in which equitable prejudgment interest is awarded as a matter of course when the trier of fact finds that damages accrued before the time of judgment."). We have recognized, however, that the district courts can make an exception to this general rule if they "cannot address through other means any equitable concerns that favor the defendant," even to the point of eliminating the award of interest entirely. *Concorde Limousines,* 835 F.2d at 549. If the district court denies prejudgment interest without explanation, our appropriate course is to remand the

issue so that the court may either explain the exceptional circumstances warranting the denial of interest or award interest at the appropriate rate. *Id.* at 549–50; *American Int'l Trading Corp. v. Petroleos Mexicanos,* 835 F.2d 536, 540–41 (5th Cir.1987); see also *Richter,* 939 F.2d at 1197–98 (affirming the denial of prejudgment interest for the reasons given by the district court).

We conclude that remand is necessary in the instant case. It is tempting to conclude simply that the former shareholders of Isoetec are foreclosed from receiving prejudgment interest because it was denied them by the arbitrator. *See Schlobohm,* 806 F.2d at 584 ("This is not a case in which the parties have submitted their entire dispute to arbitration, thus arguably preventing the district court from modifying the award by adding pre-award interest."). It does not appear to us, however, that the issue of prejudgment interest was presented to the arbitrator; indeed, the arbitrator was not even requested to perform the final calculation of the Isoetec purchase price, but rather only to rule on various claims with respect to Isoetec's 1989 profits. It was left to the district court to perform the final calculation. The court, we note, concluded that the final purchase price under the arbitrator's decision was $1,351,-208, and that Executone was entitled to a credit of $48,579 for overpayment *plus interest* from April 1, 1990. Interest on the former Isoetec shareholders' $1,187,000 damages award was denied as not "appropriate" without further explanation.

Discerning no reason for the dissimilar treatment of the parties, we must VACATE the district court's denial of prejudgment interest to the former shareholders of Isoetec and REMAND for further proceedings on the matter. We intimate no views on the merits of whether the former Isoetec shareholders are entitled to prejudgment interest.

As for the district court's decision to tax all costs of court to the parties incurring the same, we have recognized that the lower courts have wide discretion in this determination and that reversal is warranted only upon a clear showing of abuse of discretion. *Sidag Aktiengesellschaft v. Smoked Foods Prods. Co.,* 854 F.2d 799, 801–02 (5th Cir.

1988). The former Isoetec shareholders have not made the requisite showing, so we AFFIRM the award of costs.

### 2. *Attorneys' Fees*

■ The former Isoetec shareholders next argue that the district court erred in failing to award them their attorneys' fees incurred since the date of the arbitration award in their attempt to enforce that award. For support they rely on our decision in *International Ass'n of Machinists, Dist. 776 v. Texas Steel Co.*, 639 F.2d 279, 283 (5th Cir. Unit A Mar. 1981), in which we held that a district court's refusal to award attorneys' fees to a union for seeking judicial enforcement of an arbitration award should be reviewed for abuse of discretion. In *Texas Steel* we reversed the district court's denial of attorneys' fees, holding that the employer's grounds for challenging the arbitration award were "without merit" and that its refusal to abide by the arbitration award on the grounds raised was "without justification." *Id.* at 284; *see also Amalgamated Meat Cutters of N. Am., Local Union 540 v. Great W. Food Co.*, 712 F.2d 122, 125 (5th Cir.1983) ("A party to an arbitral award is not entitled to the attorneys' fees it incurs in enforcing that award unless the noncomplying party's refusal to abide by the award was 'without justification.'"). *See generally* John B. Spitzer, Annotation, *Labor Arbitration: Recoverability of Attorneys' Fees in Action to Compel Arbitration or to Enforce or Vacate Award*, 80 A.L.R.Fed. 302 (1986). Under the circumstances presented in *Texas Steel*, we concluded that the denial of attorneys' fees was an abuse of discretion. 639 F.2d at 284. Because Executone's challenge of the arbitration award, unlike that of the employer in *Texas Steel*, goes to the question of the arbitrator's authority, and because Executone's position is not a frivolous one, we find no abuse of discretion by the district court in the instant case.

■ The former Isoetec shareholders argue in the alternative that they are entitled to recover their attorneys' fees under the terms of the purchase agreement itself. The agreement provided, in pertinent part, "The prevailing party in any litigation, arbitration, or other proceedings arising out of this Purchase Agreement shall be reimbursed for all reasonable costs and expenses incurred in such proceedings, including reasonable attorneys' fees." Plainly all of the parties emerged from arbitration with less than they had hoped to receive. The arbitrator concluded that Executone was the "prevailing party." We find no error in the district court's implicit agreement with the arbitrator that the former Isoetec shareholders were not "prevailing parties" entitled to attorneys' fees and so AFFIRM the denial of fees.

### 3. *The Award of Executone Stock*

■ The district court's final judgment ordered the former Isoetec shareholders to exchange the 246,619 shares of Executone stock that they had previously received for 383,399 new shares of Executone stock under the terms of the purchase agreement. The former Isoetec shareholders now contend that the district court should not have awarded them the Executone stock but rather should have awarded them the cash value of that stock as it existed in 1990, $912,489. Further discussion of the terms of the purchase agreement is necessary to unravel this argument.

The purchase agreement allowed Executone to pay part of the purchase price for Isoetec with Executone stock. At the February 1990 closing, it appears that Executone opted to pay some $912,000 of the interim purchase price with Executone stock. At the time, the stock was worth $3.70 per share on the national stock exchange, so the Isoetec shareholders now defendants in this suit received 246,619 shares. The purchase agreement also provided that the number of shares would be adjusted at the time the final Isoetec purchase price was determined to reflect the value of Executone stock after the public announcement of Executone's 1989 year-end earnings and thereby to maintain the value of the consideration. According to the former Isoetec shareholders, this provision entitled them to receive another 136,780 shares in May of 1990, to reflect a drop in the price of Executone stock. The purchase agreement also required Executone to register the stock paid to the Isoetec shareholders

with the SEC; Executone asserts that it did file the required registration form and concedes that the registration never became effective, but Executone alleges that this failure was due to the misconduct of the Isoetec shareholders in procuring the audit. The lack of registration has apparently prevented the former Isoetec shareholders from selling their Executone stock.

As we have noted, the arbitrator did not compute the final Isoetec purchase price or address the issue of how the final purchase price should be paid to the former Isoetec shareholders. The district court, therefore, could not simply enforce the arbitrator's award but rather was required to enforce the parties' contracts consistently with the arbitrator's award. After the arbitrator's award was released, the former Isoetec shareholders moved for summary judgment requesting judgment to be rendered in their favor in cash; Executone's cross-motion for summary judgment contended that the number of shares it had issued to the former Isoetec shareholders would have to be adjusted, but only so that identical percentages of the final purchase price and the interim purchase price would be represented by Executone stock and using the relevant 1990 stock prices as references. The relevant portion of the purchase agreement provides as follows:

> The number of shares of Restricted Stock issued at Closing (the "Estimated Restricted Stock") shall also be adjusted [upon calculation of the final Isoetec purchase price] as necessary to reflect the change in the average closing price used to calculate the number of shares of Restricted Stock issued at Closing from the average closing price over the 20 trading days immediately prior to Closing ... to the average closing price of Executone's publicly-traded common stock, par value $.01 per share, over the 20 trading days that occur after the public announcement of Executone's ... 1989 year-end earnings.... If the number of shares of Restricted Stock is to be adjusted upward, Executone shall promptly issue new certificates in the aggregate amount of such increase, in the names of the holders of the Estimated Restricted Stock.

From our review of the record is apparent that the district court accepted the position advanced by Executone's counsel at the oral argument regarding the parties' post-arbitration summary judgment motions. According to the presentation made by Executone's counsel, Executone's 1989 year-end earnings were announced in March 1990, followed by a drop in the value of Executone's stock to an average of $2.38 over the next twenty days. The district court used this $2.38 figure in ordering Executone to issue 383,399 shares of stock to the former Isoetec shareholders in exchange for the 246,619 shares previously issued (246,619 shares at $3.70 per share is equivalent in value to 383,399 shares at $2.38 per share). The final judgment thus seems to conform to the plain language of the purchase agreement.

According to the former Isoetec shareholders, however, this forced exchange of Executone stock is inadequate to put them in the same position as if the contract had been carried out because the Executone stock is now worth much less than it was in May of 1990. *See Reynolds Metal Co. v. Westinghouse Elec. Corp.*, 758 F.2d 1073, 1079 (5th Cir.1985) ("[T]he rules for contract damages are intended to place the victim of the breach in the same position he would have occupied had the breach not occurred."). The former shareholders also assert that all the parties contemplated that the former Isoetec shareholders would sell their Executone stock as soon as possible after Executone registered the stock in 1990.

Executone responds that the former shareholders are making an equitable argument that they are in no position to assert. In Executone's view, the Isoetec shareholders knew that the purchase agreement expressly provided that the Executone stock delivered at the interim closing could not be sold, and they also knew that they would not receive transferable Executone stock until the final purchase price had been calculated. Executone contends that the shareholders are to blame for the long delay in calculation of the final purchase price—because they overstated Isoetec's 1989 earnings and because they delayed the arbitration and forced Executone to file suit. Executone also contends

that the former shareholders' complaints about Executone's delay in registering its stock with the SEC is an exercise in misdirection. In Executone's view, its initial failure to register the stock was Isoetec's fault because Isoetec delayed in providing Executone with the 1989 audit report; Executone asserts in its brief that it has now complied with the district court's order requiring Executone to deposit the stock with the district court and to file a registration statement.

The district court's order with respect to the Executone stock is, in our view, in harmony with the relevant provisions of the purchase agreement. Finding no error, we AFFIRM that portion of the final judgment.

### 4. *The SAR Holders*

 The former Isoetec shareholders raise one other issue. Certain Isoetec employees held stock appreciation rights ("SARs") in Isoetec that entitled them to receive cash for their SARs upon the sale of Isoetec. Executone entered into an agreement (apparently at the time of the February 1990 closing) with the SAR holders whereby the SAR holders agreed that they would accept some Executone stock in lieu of cash upon the sale of Isoetec to Executone. According to Executone, the SAR holders received Executone stock worth a total of $290,001, plus $190,834 in cash. The district court's final judgment stated as follows:

> It is further ORDERED that upon entry of this Judgment the defendants, representing the former shareholders of Isoetec Texas, Inc., surrender to Executone the non-negotiable promissory notes and convertible promissory notes issued by Executone to the former shareholders of Isoetec on February 6, 1990, *and any stock appreciation rights they received in Executone stock.*

(emphasis added).

The former Isoetec shareholders claim that the district court erred in requiring the SAR holders to surrender the Executone stock they received in lieu of their SAR cash payments. In their view, the SAR stock "has no relation to the purchase price stock and constitutes no part of this suit" because

"Executone has requested no relief" from the SAR agreement. The former shareholders also complain that this portion of the judgment below affects persons not parties to this suit, but as Executone points out, the part of the judgment complained of orders only the "*defendants,* representing the former shareholders of Isoetec ... [to] surrender to Executone ... any stock appreciation rights they received in Executone stock" (emphasis added). Thus, the order was directed only to the parties before the court.

Executone responds that its agreement with the SAR holders provided that the stock issued to them would be returned to Executone, revalued, and reissued once the final purchase price was determined. Executone also points out that the shareholders themselves filed a brief with the district court requesting the court to recalculate the amounts due the SAR holders as part of its final judgment. The former shareholders respond that the sole purpose of the recalculation was to ensure an accurate calculation of the purchase price because the SARs were included on Isoetec's income statement as an expense.

We review the record to determine when issues regarding the rights of the SAR holders were raised in the district court. It appears that the parties proposed final Isoetec purchase prices to the district court in their post-arbitration motions for summary judgment, each purportedly based on the arbitrator's decision. Executone contended that the final Isoetec purchase price should be $1,093,921. The former Isoetec shareholders filed a response to Executone's motion in which they argued that Executone's figure was incorrect; part of their argument was that Executone's calculation assumed that the value of the SAR holders' rights remained $480,844, as originally calculated, and that the SAR holders' rights should actually be devalued to $202,500 under the terms of the arbitrator's award. In a subsequent response to Executone, the former shareholders again contended that the value of the SAR holders' rights had to be reduced in order to calculate the final purchase price. Attached to that response is a copy of the agreement drawn up to deal with the rights

of the SAR holders. According to this agreement, the SAR holders were divided into three classes, and Executone was to pay the members of each class cash or Executone stock in satisfaction of the SAR holders' rights. The amounts of cash and stock paid by Executone were to "be adjusted in the same manner as the consideration received by the Shareholders pursuant to the Purchase Agreement, if at all."

After the district court entered its order granting the former Isoetec shareholders' summary judgment motion and denying that of Executone, the former shareholders filed a proposed final judgment that did not mention the SAR holders. Executone filed an objection, complaining that the proposed final judgment ignored the recalculation of the SAR holders' rights that the former shareholders had earlier called for and arguing that "any person receiving benefits of this judgment should have to tender their stock appreciation rights. Otherwise, they will be afforded a double recovery." The former Isoetec shareholders responded that Executone was claiming "[f]or the first time in this case" a right to offset for the impact of the arbitrator's decision on the SARs. The former shareholders acknowledged that the arbitration award reduced Isoetec's liability for SARs and thus increased Isoetec's income, but they contended that Executone's claim for any overpayment to the SAR holders had never been an issue in the case. They concluded that "Executone has agreements with the SAR holders (of whom only Ed White is a party here), which agreements cover any reduction in the amount of the SARs and how such reduction would be handled, and those matters are best left to those agreements." The district court then entered the final judgment, including the passage quoted *supra* about which the former shareholders now complain.

Executone explains the district court's decision as follows. At the closing, the SAR holders received $290,001 worth of Executone stock and $190,834 in cash. In their calculation of the final purchase price, the former Isoetec shareholders themselves represented to the court that the SARs were worth only $202,500. Thus, argues Execu-

tone, the court acted properly in ordering the SAR holders (or at least the one before the court, defendant White) to return the stock that they had received for their SARs. The problem with this logic, of course, is that the district court's order leaves the SAR holders as a group with even less than the $202,500 that the former Isoetec shareholders argued that the SAR holders were entitled to receive.

We find ourselves unable to pass on the merits of the former shareholders' argument and must remand for further proceedings. Executone's own argument in support of the district court's order implies that the SAR holders are entitled to receive new Executone stock to reflect the final purchase price, in accordance with the provisions of the purchase agreement. The district court gave no explanation for divesting the SAR holders of the Executone stock that they had received for their SARs. We must therefore VACATE the portion of the district court's final judgment ordering the defendants to surrender to Executone any stock appreciation rights they had received in Executone stock and REMAND this issue for clarification. Once again, we intimate no views whatsoever on the proper outcome.

## IV. CONCLUSION

We VACATE and REMAND the portion of the final judgment requiring the defendants to surrender any stock appreciation rights they received in Executone stock. We also VACATE the district court's denial of the defendants' request for prejudgment interest, and we REMAND for further proceedings consistent with this opinion. The remainder of the district court's judgment is AFFIRMED.