IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 97-20279

---

NAURU PHOSPHATE ROYALTIES, INCORPORATED, (Texas),

Plaintiff - Appellee

versus

DRAGO DAIC INTERESTS, INCORPORATED,

Defendant - Appellant

---

Appeal from the United States District Court
for the Southern District of Texas

---
March 31, 1998

Before HIGGINBOTHAM and STEWART, Circuit Judges, and WALTER[*], District Judge.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Drago Daic Interests, Inc. appeals a district court order confirming the award granted to Nauru Phosphate Royalties (Texas), Inc. in an arbitration proceeding. The arbitration panel determined that DDI materially breached the Development Agreement between Nauru and DDI and held the beneficiaries of the agreement, Drago Daic, Trustee, and Montgomery-666, bound by its award. This

---

[*] District Judge of the Western District of Louisiana, sitting by designation.

case asks us to determine whether Nauru's liability on the Promissory Note was properly before the arbitration panel. We hold that the arbitration panel did not exceed its authority in ruling on Nauru's liability on the Promissory Note and AFFIRM the district court's judgment. We reject any suggestion that because Daic Trustee and M-666 were not parties to the arbitration or to this case, the breach of the Development Agreement and Nauru's consequent non-liability on the Promissory Note were beyond the reach of the arbitration. Finally, the district court did not err in concluding that DDI was responsible for Nauru's loss of reimbursement funds for 122 lots and for cost overruns incurred in excavating a drainage ditch.

I.

In 1990, Nauru Phosphate Royalties, Inc., a Delaware corporation, entered into a sale and development agreement with three parties - (i) Drago Daic Interests, Inc., (ii) Drago Daic, Trustee, and (iii) Montgomery 666, Ltd. Nauru purchased 668 acres in Montgomery County, Texas, from Daic Trustee and M-666 for $5 million in cash and an $8 million Promissory Note. The Promissory Note was secured by a Deed of Trust lien on the land being sold. Nauru agreed to retain DDI, as developer, to develop the land into an up-scale residential housing subdivision, called Bentwood, with a country club, golf course and the like.

The Development Agreement and Promissory Note, when read together, set up the following arrangement: Nauru was to fund all

2

monies necessary for the development project and be reimbursed for all of its expenditures in a given calendar year from that year's revenue. If expenditures exceeded revenues, no payments would be made other than to Nauru. Only if revenues exceeded expenditures would payment be made on the Promissory Note. This was to continue until the Promissory Note was fully paid or the project sold, whichever came first. Stated directly, in the event that revenues did not exceed expenditures, the noteholders, Daic Trustee and M-666, would not be entitled to payment on the Promissory Note.

The project began in 1990 and continued into 1995. The property never achieved enough cash flow to pay current expenses, much less reimburse Nauru or make any payments on the Promissory Note. DDI was dissatisfied with Nauru's timeliness of funding, Nauru was unhappy about the costs and expenses, and the noteholders, Daic Trustee and M-666, were unhappy about not being paid. Eventually, Nauru gave notice of intent to terminate DDI as developer and instituted an arbitration proceeding.

In the arbitration, Nauru claimed DDI fraudulently induced Nauru to enter into the transaction and to continue development with various cost overruns. In addition, Nauru claimed that DDI materially breached the Development Agreement and sought indemnification from DDI for any liability on the contingent, non-recourse Promissory Note to Daic Trustee and M-666. DDI counterclaimed that Nauru's actions caused the project to fail. DDI also sought to recover "profits" which assertedly were due.

In 1996, the arbitration panel (2-1) determined that DDI had committed thirteen material breaches of the Development Agreement between the parties, and Nauru had committed three non-material breaches of the Development Agreement. The panel responded to Nauru's claim for indemnification of any liability on the Promissory Note by deciding that Nauru had no further liabilities to DDI under the Development Agreement and that Nauru had no liability for payment of the $8 million Promissory Note. This Note was executed by Nauru and payable to the noteholders, Drago Daic, Trustee and Montgomery-666, who were not parties to the arbitration proceeding. Finally, the panel decided that DDI was liable to Nauru for over $1.8 million as a result of DDI's material breaches of the Development Agreement.

Nauru then filed an action in district court to confirm the arbitration award. DDI moved to dismiss for lack of jurisdiction and also moved to vacate or modify the award. The district court denied the motion to dismiss and referred the matter to a magistrate judge, who recommended that the award be confirmed. In 1997, the district court accepted the magistrate judge's findings and recommendations and confirmed the arbitration award. This appeal followed.

II.

We must first determine if there is federal jurisdiction. DDI contends that the district court erred in sustaining federal jurisdiction on the basis of diversity of citizenship[2].

DDI is a Texas corporation with its principal place of business in Texas and Nauru is a Delaware corporation. Complete diversity turns here on the location of Nauru's principal place of business. Nauru argues that its principal place of business is in Australia or Nauru, a small island republic in the south Pacific. DDI argues Nauru's principal place of business is in Texas.

This court applies a "total activity" test to determine the principal place of business. J.A. Olson Co. v. City of Winona, Miss., 818 F.2d 401, 411-12 (5th Cir. 1987). We look to the nature, location, importance, and purpose of a corporation's activities and the degree to which those activities bring the corporation into contact with the local community. Id. Three general principles drawn from the insights of Professor Wright guide the inquiry (see Wright, Federal Courts § 27, at 167-68 (5th ed. 1994)):

> (1) when considering a corporation whose operations are far flung, the sole nerve center of that corporation is more significant in determining principal place of business; (2) when a corporation has its sole operation in one state and executive offices in another, the place of activity is regarded as more significant; but (3) when the activity of a corporation is passive and the "brain" of the corporation is in another state, the situs of the corporation's brain is given greater significance.

---

[2] It is well-established that the Federal Arbitration Act does not create federal jurisdiction. Some independent jurisdictional basis, either diversity or federal question, must be shown. See, e.g., Baltin v. Alaron Trading Corp., 128 F.3d 1466, 1469 (11th Cir. 1997).

5

<u>Olson</u>, 818 F.2d at 411 (citations omitted).

DDI asserts that the second <u>Olson</u> principle is applicable and locates Nauru's principal place of business in Texas because, even if its offices are in Nauru, its sole operations are in Texas. Nauru contends the third <u>Olson</u> principle is applicable and establishes its principal place of business in Nauru or Australia because its investment in Bentwood is passive and the bulk of the corporation's activities involve managing its affairs from its nerve center in Nauru or Australia. Thus, the critical inquiry involves the nature and quality of Nauru's activities with regard to Bentwood.

The district court determined that at the time this action was filed Nauru was a passive investor in land and its primary activities were management-oriented. This determination is supported by the record which indicates that Nauru's nerve center or "brain" is in Nauru or Australia, not in Texas. Bentwood is the only investment asset of Nauru, which was formed for the sole purpose of acquiring this asset. Nauru had four members on its board of directors, each of whom is a citizen of and resides in Nauru. Nauru has three officers - a president, a treasurer/secretary and an assistant secretary. The president resides in Nauru, the treasurer/secretary resides in Australia, and the assistant secretary resides in Houston, Texas. Nauru maintains its offices and staff in Nauru and Australia. The assistant secretary functioned as a conduit of information to the directors and other

6

officers in Australia and Nauru, and the Nauru Board and its officers made substantive and managerial-level decisions.

The single exception to the lack of significant operations at Bentwood is the Bentwood Country Club which includes the golf course and restaurant/bar and generates a significant amount of gross revenue. The country club is operated by two wholly-owned subsidiaries of Nauru - the Bentwood Country Club, Inc. and Bentwood Private Club, Inc.

Other circuits have held that the operations of a subsidiary are not to be imputed to a parent company for purposes of locating the parent's principal place of business, at least so long as the subsidiary is not the *alter ego* of the parent. Taber Partners, I v. Merit Builders, Inc., 987 F.2d 57, 61-63 (1st Cir.) cert. denied, 510 U.S. 823 (1993); Danjaq S.A. v. Pathe Comm. Corp., 979 F.2d 772, 774-76 (9th Cir. 1992); Pyramid Sec. Ltd. v. IB Resolution, Inc., 924 F.2d 1114, 1120 (D.C. Cir.), cert. denied, 502 U.S. 822 (1991). This court has attributed a subsidiary's citizenship to its parent company in *alter ego* situations where the subsidiary's wrongful conduct is at issue. Kuehne & Nagel (AG & Co.) v. Geosource, Inc., 874 F.2d 283, 290-91 (5th Cir. 1989). There is no evidence that the corporate form of Nauru's subsidiaries should be disregarded and the subsidiaries treated as *alter egos* of Nauru.

The district's court determination that Nauru's principal place of business is not in Texas is amply supported by the record and hence is not clearly erroneous.

7

III.

A court "may not reconsider an award based on alleged errors of fact or law or misinterpretation of the contract." Exxon Corp. v. Baton Rouge Oil & Chemical Workers Union, 77 F.3d 850, 853 (5th Cir. 1996) (citing United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 36 (1987)); Executone Info. Sys., Inc. v. Davis, 26 F.3d 1314, 1320 (5th Cir. 1994) ("We must sustain an arbitration award even if we disagree with the arbitrator's interpretation of the underlying contract as along as the arbitrator's decision 'draws its essence' from the contract.") (citations omitted). As long as an arbitration award "is rationally inferable from the letter or purpose of the underlying agreement," the award should be upheld regardless of alleged errors of law or fact. Executone, 26 F.3d at 1320.

A.

DDI contends that the arbitration panel's decision regarding Nauru's liability on the Promissory Note was not enforceable since the panel exceeded its authority. DDI urges that Daic Trustee and M-666 signed the Development Agreement only with respect to Section 3.7 and Article 5, and the applicability of the Development Agreement to them is limited to these provisions. Relatedly, DDI contends that Daic Trustee and M-666 were not parties to the arbitration, and the issue of Nauru's liability on the Promissory Note could not be decided in their absence.

8

Their arguments are not persuasive. At the outset, the provisions of both the Development Agreement and the Promissory Note reveal that the two documents are inextricably intertwined. The first paragraph in the Promissory Note states in relevant part:

> The terms of the Earnest Money Contract and the Development Agreement are hereby incorporated into this Note as if fully set forth in this Note.

Not only does it fully incorporate by reference the Development Agreement, the Promissory Note is explicitly referenced throughout the Development Agreement.

> The arbitration clause in the Development Agreement provides:

> Any dispute, controversy or claim arising out of or in connection with or relating to this Agreement or any breach or alleged breach hereof, shall, upon the request of any party involved, be submitted to and settled by arbitration in Houston, Texas pursuant to the rules then in effect of the American Arbitration Association.

As this court has noted, "[w]hen parties include such a broad arbitration clause, they intend the clause to reach all aspects of the relationship." Valentine Sugars, Inc. v. Donau Corp., 981 F.2d 210, 213 n.2 (5th Cir.), cert. denied, 509 U.S. 923 (1993). Here, Nauru's demand for arbitration states that DDI's failure to perform pursuant to the Development Agreement affects its liability on the Promissory Note. Thus, DDI knew that Nauru's liability on the Promissory Note was indeed an issue before the arbitration panel.

Further, by virtue of the two agreements, the Development Agreement had to be performed without material breach by DDI in order for the noteholders to be paid. Nauru's duty to make payment pursuant to the Promissory Note was a "conditional obligation," and Nauru had "certain set-off rights" against its obligation to pay

9

which were specified in the Development Agreement. By the very terms of the Promissory Note, any material breach of the Development Agreement by DDI would put payment on this Note at risk. The evidence on record shows that Mr. Drago Daic wanted DDI to be the developer of Bentwood pursuant to the Development Agreement to ensure that the Promissory Note would be paid. Thus, the Development Agreement and the Promissory Note were intimately related to one another, and the district court did not err in finding that the arbitration panel had the authority to rule on Nauru's liability on the Promissory Note since it was intimately "related to" the Development Agreement. Indeed, it goes to the heart of the dispute over DDI's performance of the Development Agreement.

The contention that the arbitration panel exceeded its authority in finding no liability on the Promissory Note because Daic Trustee and M-666 are not bound by the panel's findings fails in its premise. As effective third-party beneficiaries, the noteholders may be precluded from litigating the issue of breach of the Development Agreement in any subsequent proceeding and may be bound by the panel's finding of non-liability on Nauru's part for the Promissory Note. Guscott _et al_. v. City of Boston, 958 F.2d 361, 1992 WL 55889, at *3 (1st Cir. Mar. 25, 1992) (noting that third-party beneficiary lacked right to enforce a contract for its own benefit when contracting party breached a contractual condition that had to be satisfied for third-party beneficiary to receive payment); Restatement (Second) of Judgments § 56, cmt. a ("When a

10

judgment is entered in an action between the promisee and the promisor that terminates the obligation so far as the promisee is concerned..., it... discharges the obligation in favor of the beneficiary."); 18 Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 4460, at 530 (1981) ("Substantive rules governing the rights of third-party beneficiaries ... shape preclusion rules. So long as the promisee retains the power to discharge the obligation of the promisor, the third-party beneficiary is precluded by litigation between the promisee and promisor."); Restatement (Second) of Contracts § 309(2) & § 309(2) cmt. b ("If a contract ceases to be binding in whole or in part because of ... present ... failure of performance, the right of any beneficiary is to that extent discharged or modified." "Where there is a contract, the right of a beneficiary is subject to any limitations imposed by the terms of the contract.").

Our decision to hold that the arbitration award effectively decides any "right" of Daic Trustee and M-666 to be paid under the Promissory Note is also supported by the district court's findings. The district court noted that DDI, which did participate in the arbitration, had the same interests at stake as Daic Trustee and M-666. The record in this case demonstrates that the man behind all three entities - Daic Interests, Daic Trustee and M-666, - Mr. Drago Daic[3], fully participated in the arbitration proceedings.

---

[3] The evidence on record establishes the following:
Mr. Drago Daic is the sole owner of DDI.
Mr. Drago Daic, as Trustee, represents the 3-D Trust, a verbal trust established by Mr. Drago Daic for his children and grandchildren.

11

The district court concluded that the two noteholders had notice that liability on the Promissory Note would be resolved by the arbitration panel since Nauru in its arbitration complaint contested the demands made by Daic Trustee and M-666 for payment pursuant to the Promissory Note. Thus, the record establishes that there was sufficient identity of interests among the three entities, DDI, Daic Trustee and M-666, that it would be fair and appropriate to hold the noteholders bound by the panel's finding of non-liability on the Promissory Note.

It bears mention that an arbitration award may be enforced in a subsequent proceeding against parties that did not participate in an arbitration in circumstances when the parties to the arbitration had related and congruent interests which were properly advanced during the arbitration. See, e.g., Isidor Paiewonsky Assocs., Inc. v. Sharp Properties, Inc., 998 F.2d 145, 155 (3d Cir. 1993) (holding non-parties to arbitration clause since they have "related and congruent interests" with the principals); Cecil's, Inc. v. Morris Mechanical Enters., Inc., 735 F.2d 437, 439-40 (11th Cir. 1984) (enforcing indemnification agreement between general

---

Fifty-five percent of M-666 is effectively controlled by Mr. Drago Daic. Another company owned and controlled by Mr. Drago Daic, Imperial Marketing, owns another 19.33 % of M-666.

Mr. Drago Daic, individually, or in his capacity as Trustee, owns a 75% interest in the Promissory Note.

The land which was sold to Nauru for the Bentwood development was initially purchased by Mr. Drago Daic in 1983 for approximately $3.8 million. Within 30 days of purchasing the land, Mr. Drago Daic sold the land at a substantial profit in equal 50% shares to Drago Daic, Trustee and M-666. Drago Daic, Trustee and M-666 entered into a joint venture agreement with respect to the land, with Mr. Drago Daic acting as managing joint venturer.

contractor and subcontractor even though underlying liability was determined by arbitration to which subcontractor was not a party); _In re_ Oil Spill by the "Amoco Cadiz", 659 F.2d 789, 795-96 (7th Cir. 1981) (binding plaintiff to outcome of arbitration between its principal and defendant even though plaintiff would be non-party to arbitration proceedings).

We are cautious in concluding that an arbitration panel can effectively determine the "rights" of the noteholders when they were not formal parties to the arbitration. See First Options, Inc. v. Kaplan, 115 S.Ct. 1920, 1924 (1995) (noting that "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clear and unmistakable' evidence that they did so") (citations omitted). As a general matter, the interests of judicial economy ought not to be furthered by drawing non-parties within the gravitational force of an arbitration by shortchanging their legitimate wish to pursue their claims in court. That is not the case here. The non-parties to the arbitration, Daic Trustee and M-666, were third-party beneficiaries of the contract between the parties in arbitration with an interest contingent upon faithful performance of the contract by DDI. When DDI breached the Development Agreement, the noteholders' interests were necessarily at risk. The interests of DDI, Daic Trustee and M-666 were identical and adequately represented by a party in arbitration, DDI, and Daic Trustee and M-666 undoubtedly attempted to enforce the Development Agreement against Nauru. The heart of the matter is that the value of the Promissory Note depended

13

entirely upon performance by others over whom the noteholders had no legal control -- not in the sense that their asset was determinable by external market forces -- but by the very terms of the Promissory Note they held. In these circumstances, the district court did not err in finding a failure of a condition for liability upon the Promissory Note, a decision that forecloses Daic Trustee and M-666.

Finally, that the arbitration award effectively binds Daic Trustee and M-666 preventing them from relitigating the breach of the Development Agreement works no injustice. While Daic Trustee and M-666 were not formal parties to the arbitration, they were parties to the agreement to arbitrate. Since the Promissory Note incorporated the Development Agreement by reference, the sweeping arbitration clause in the Development Agreement bound both Daic Trustee and M-666. Heinhuis v. Venture Assoc., Inc., 959 F.2d 551, 553-54 (5th Cir. 1992) (holding that parties to an excess insurance policy, which incorporated by reference the underlying insurance policy, were bound by the arbitration clause contained in the underlying insurance policy). Indeed, in a letter dated February 9, 1995, Daic Trustee and M-666 attempted to enforce sections of the Development Agreement, other than Sections 3.7 and 5, against Nauru. An entity's attempt to enforce an agreement that contains an arbitration clause provides clear and unmistakable evidence that the entity regards itself bound by the arbitration clause. See Hughes Masonry Co. v. Greater Clark County Sch. Bldg. Corp., 659 F.2d 836, 839 (7th Cir. 1981); Sunkist Soft Drinks, Inc. v.

14

Sunkist Growers, Inc., 10 F.3d 753, 757-58 (11th Cir. 1993), cert. denied, 513 U.S. 869 (1994); J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A., 863 F.2d 315, 319-21 (4th Cir. 1988); McBro Planning & Dev. Co. v. Triangle Elec. Constr. Co., 741 F.2d 342, 344 (11th Cir. 1984); Sam Reisfeld & Son Import Co. v. S.A. Eteco, 530 F.2d 679, 681 (5th Cir. 1976).

B.

The arbitration panel concluded that DDI was responsible for Nauru's loss of reimbursement funds for 122 lots located in the Porter Municipal Utility District, which was calculated by the panel to be $477,000.

DDI contends that the Development Agreement did not allow for loss of reimbursement funds, but rather provided for an offset against other amounts due under the Development Agreement and Promissory Note. The Development Agreement provided with respect to this expected MUD reimbursement expense:

> It is anticipated that certain drainage, waste-water treatment, water purification and other utility facilities (the "Utility Improvement") will be required to be constructed on the Property in connection with the Project. Developer expects that the Municipal Utility District ("M.U.D.") to be formed to operate such Utility Improvements will purchase the Utility Improvements at a price equal to seventy percent (70%) of the cost incurred in constructing such Utility Improvements.

The arbitration record shows that some of the development property was located in an existing MUD, the Porter MUD, while the rest of the property was in a MUD created specifically for the development, the Bentwater MUD.

15

DDI argues that the arbitration panel did not apply the proper contractual remedy and miscalculated the amount of the award. We are not persuaded. The arbitration panel's implicit assumption that this Section, which allowed for offsets of reimbursement losses, did not apply to reimbursement losses associated with an existing MUD, the Porter MUD, but rather was directed at a MUD to be formed in the future, is an interpretation of this Section that the arbitration panel was allowed to make. See Executone, 26 F.3d at 1320.

The arbitration panel also concluded that DDI was responsible for cost overruns incurred in excavating a large drainage ditch. DDI contends that the arbitration panel's decision that it should reimburse Nauru for cost overruns on the drainage ditch is contrary to principles of waiver under Texas law. DDI argues that Nauru waived any right to complain about cost overruns since it failed to object to a management decision made by DDI regarding the excavation.

There is no evidence from the award itself that the arbitration panel ignored Texas law on waiver. On the contrary, the panel might reasonably have attributed the cost overruns to DDI, which was found to have mismanaged the development project in several material respects, and, under Section 6.1(c) of the Development Agreement, DDI could be held responsible for these cost overruns. The district court correctly confirmed the arbitration award regarding the Porter MUD and the drainage ditch.

16

IV.

We hold that the district court had jurisdiction and did not err in confirming the arbitration award.

AFFIRMED.