REVISED, JUNE 12, 1998

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT
_____

No. 96-20497
_____


PENNZOIL EXPLORATION AND
PRODUCTION COMPANY; PENNZOIL     Plaintiffs - Appellees-Cross-Appellants,
INTERNATIONAL INC; PENNZOIL
CASPIAN DEVELOPMENT CORPORATION;
PENNZOIL CASPIAN CORPORATION,

                                    versus

RAMCO ENERGY LIMITED; RAMCO HAZAR
ENERGY LIMITED,
                          Defendants - Appellants-Cross-Appellees.

_____

          Appeal from the United States District Court for the
                      Southern District of Texas
_____
____

                         May 13, 1998

Before JOLLY, EMILIO M. GARZA, and JOHN R. GIBSON,[*] Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

     The issue before us is whether Ramco's[2] dispute with Pennzoil over

development rights in the Karabakh Prospect, granted to Pennzoil by the

Azerbaijan Government to satisfy obligations arising from work performed

on a gas utilization project, is subject to binding arbitration.  The

district court held that the dispute is arbitrable under a Joint

_____

     [*]Circuit Judge of the Eighth Circuit, sitting by designation.

     [1]Throughout this opinion "Ramco" will refer to "Ramco Hazar Energy
Limited," formerly known as "Ramco Energy Limited."  We will refer to
the various Pennzoil companies as simply Pennzoil.

Operating Agreement entered into by Ramco, Pennzoil, and various other energy companies. Ramco appeals, arguing that the dispute does not arise under or relate to the Joint Agreement, but rather is governed by a June 7, 1993 letter agreement between Ramco and Pennzoil that does not contain an arbitration clause. We affirm the district court's judgment.

Ramco and Pennzoil are parties to numerous agreements relating to the development of oil and gas in the Apsheron Trend, an area located in the Caspian Sea offshore Azerbaijan.

Ramco and Pennzoil's contractual relationship originated in a February 13, 1992 letter agreement, referred to as the "Letter of Intent." In the Letter of Intent, Ramco and Pennzoil agreed to conduct a feasibility study for the development of the Guneshli[3] and Chirag[4] Fields, two fields located in the Apsheron Trend. The Letter of Intent outlined Ramco and Pennzoil's financial relationship and allocated any potential development rights the Azerbaijan Government may award the parties in the two fields.

On May 22, 1992, Pennzoil, Ramco, and Kaspmorneftegas (KMNG), the negotiating representative of the Azerbaijan Government, entered into an "Agreement To Construct A Geological Model of the Guneshli Field in the Azerbaijan Sector of the Caspian Sea." This agreement, expressing "a view to enhancing development ... from Guneshli Field," was referred to as the "Guneshli Agreement." It contains an arbitration clause stating that "[a]ny disputes between the parties will be settled,

---

[3]This field was initially referred to as the "April 28 Field," and Guneshli is, in some agreements, spelled differently.

[4]The letter referred to this field as the "Kaverochkin Field," later renamed Chirag.

-2-

exclusively and finally, by arbitration."

After constructing the geological model, and as a development contract for the Guneshli Field became more imminent, Pennzoil and Ramco executed a second letter agreement dated August 18, 1992. This agreement amended the parties' financial relationship and the allocation of potential development rights in the Guneshli Field as set out in the February 13 Letter of Intent.

By October of 1992, the State Oil Company of the Azerbaijan Republic (SOCAR), the new negotiating representative of the Azerbaijan Government, had not granted Ramco and Pennzoil development rights in the Guneshli Field. To secure development rights in the Guneshli Field, Pennzoil entered into a "Gas Utilization Agreement for Guneshli and Neft Dashlary Fields" with SOCAR on October 1, 1992. In this agreement, later referred to as GUP 1, Pennzoil agreed to build an offshore natural gas compressor station to capture the natural gas being vented from the Guneshli and Neft Dashlary Fields and to transport the gas to energy-starved Azerbaijan.

In conjunction with GUP 1, and on the same date, Pennzoil and Ramco, collectively as "Contractor," entered into a "General Agreement On Terms and Principles for Concluding the Guneshli Field Development Contract" with SOCAR and the Azerbaijan Government to implement a program for gathering and transporting natural gas from the Guneshli and Neft Dashlary Fields to shore. The agreement, later referred to as the "General Agreement," also provided that the parties immediately set up a committee to prepare an acceptable Production Sharing Contract (PSC) for the Guneshli Field.

In May of 1993, before Ramco and Pennzoil could secure development

-3-

rights in the Guneshli Field, SOCAR announced its intent to "unitize" the development of the Apsheron Trend, consisting of the Azeri, Chirag, and Guneshli Fields (the "ACG Unit").  In light of this decision, Ramco and Pennzoil executed the third letter agreement of June 7, 1993, defining the terms of their relationship in light of SOCAR's decision to include the Guneshli Field in the unitized development of the Apsheron Trend.  This agreement, which specifically superseded the two previous letter agreements, states:

> For the purposes of this Letter Agreement, the Gunashli, Chirag and Azeri Fields, and any other areas which shall be developed pursuant to any joint development, field management or other contract or agreement (the "Contract") granting rights to explore for, develop, produce, transport and/or market hydrocarbons from said fields, whether pursuant to Unitisation or otherwise, within the jurisdiction of the Azerbaijan Republic shall be deemed the "Contract Area."

The parties agreed that any interests in any contract relating to the "Contract Area" acquired by Pennzoil and/or Ramco shall be subject to the June 7, 1993 letter agreement.  Like the other two letter agreements, this agreement does not contain an arbitration provision.

Because of SOCAR's decision to unitize, Ramco, Pennzoil, and six other petroleum companies that had been negotiating with SOCAR for development rights in the Azeri, Chirag, or Guneshli Fields, entered into the Azerbaijan-Apsheron Trend Agreement, otherwise referred to as the "AMI Agreement."  The AMI Agreement, dated October 19, 1993,  set out the parties participating interests in the potential development rights in the unitized development of the Apsheron Trend (later referred to as the AMI area on an attached map).[5]  The costs incurred by Pennzoil

---

[5]The AMI Agreement referred to SOCAR's previous negotiations for separate production sharing agreements with three groups.  Among these were the Guneshli Field Group, comprised of Pennzoil and Ramco, and the Azeri Field Group, comprised of Ramco and five other parties

-4-

and Ramco under the GUP agreement, and the obligations of the other parties for such costs, are treated specifically and in detail in the AMI agreement. The AMI Agreement provides that "any dispute or difference arising out of or in connection with the Agreement, including any question regarding its existence, validity or termination, shall be ... resolved exclusively by arbitration."

SOCAR's decision to unitize the Guneshli, Chirag, and Azeri Fields necessarily meant that Ramco and Pennzoil would not obtain exclusive development rights in the Guneshli Field as GUP 1 and the General Agreement had contemplated. As a result, on January 17, 1994, Pennzoil, on behalf of itself and Ramco, entered into an agreement with SOCAR entitled "Additional Agreement On The Gas Utilization Project From Guneshli and Neft Dashlary Fields," referred to as GUP 2. GUP 2 set forth alternative methods for SOCAR reimbursing Pennzoil and Ramco for costs incurred in constructing the gas utilization facilities, including payment in currency, delivery of crude oil or hydrocarbon products, credit toward the total signature bonus for the first Development Agreement covering all or any part of the Azerbaijani territory to which the Pennzoil Group is a party, or any other equitable method or mechanism. The agreement contains an arbitration clause.

On September 20, 1994, SOCAR, the eight parties to the AMI Agreement, and two additional companies entered into an "Agreement on the Joint Development and Production Sharing for the Azeri and Chirag Fields and the Deep Water Portion of the Gunashli Field in the Azerbaijan Sector of the Caspian Sea." In this agreement, referred to as the "PSC," "Production Sharing Contract," or "Unit Agreement," SOCAR

---

to the AMI Agreement.

-5-

awarded participating interests to the contractor parties in the unitized Apsheron Trend, including Pennzoil and Ramco. The agreement contains references to the gas utilization agreement, and contains an arbitration clause for disputes arising between SOCAR and any or all of the contractor parties.

On November 4, 1994, the signatories to the PSC, except SOCAR, executed a Joint Operating Agreement which regulated the relation of the parties in the exercise of their rights and obligations under the PSC.

The JOA contains an arbitration clause stating:

> Any dispute, controversy or claim arising out of or in relation to or in connection with this Agreement or the operations carried out under this Agreement, including without limitation any dispute as to the validity, interpretation, enforceability or breach of this Agreement, shall be exclusively and finally settled by arbitration, and any Party may submit such a dispute, controversy or claim to arbitration.

On December 3, 1994, SOCAR and Pennzoil signed a "Payment Agreement for Costs Related to the Guneshli and Neft Dashlari Gas Utilization Project," to satisfy SOCAR's obligations pursuant to GUP 2. SOCAR and Pennzoil agreed that SOCAR would satisfy the costs incurred by Pennzoil in connection with the Gas Utilization Project by, among other things, granting Pennzoil a thirty percent equity interest in the Karabakh Prospect, an area outside the Apsheron Trend. This agreement specifically refers to the paragraph of GUP 2 setting forth the alternative methods of reimbursement, and also to Pennzoil's share of the bonus payable under the PSC or Unit Agreement.

Soon after learning that Pennzoil and SOCAR had entered the December 3, 1994 Payment Agreement, Ramco sought assurances from Pennzoil that it would share in the equity interest in the Karabakh Prospect under the terms of the June 7 letter agreement. Pennzoil

refused, and repeated its refusal to a Ramco letter demand. Pennzoil then filed a motion to compel arbitration with the district court, arguing that the Guneshli Agreement, the AMI Agreement, GUP 2, and the JOA all required arbitration of the dispute.

The district court determined that the dispute was not arbitrable under the Guneshli Agreement, the AMI Agreement, or GUP 2, but that it was arbitrable under the Joint Operating Agreement.

On appeal, Ramco argues that the district court erroneously granted Pennzoil's motion to compel arbitration under the JOA. Pennzoil cross-appeals, arguing that, in addition to the JOA, the AMI Agreement and GUP 2 also compel arbitration of the dispute.

## I.

Arbitration is a matter of contract between the parties, and a court cannot compel a party to arbitrate a dispute unless the court determines the parties agreed to arbitrate the dispute in question. See AT & T Technologies, Inc. v. Communications Workers, 475 U.S. 643, 648 (1986); Neal v. Hardee's Food Systems, Inc., 918 F.2d 34, 37 (5th Cir. 1990). "[A]s with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability." Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626 (1985). This applies with special force in the field of international commerce. Id. at 631.

Determining whether the parties agreed to arbitrate the dispute in question involves two considerations: (1) whether a valid agreement to arbitrate between the parties exists; and (2) whether the dispute in question falls within the scope of that arbitration agreement. See Webb, 89 F.3d at 258; Hornbeck Offshore (1984) Corp.v. Coastal Carriers

Corp., 981 F.2d 752, 754 (5th Cir. 1993); Midwest Mechanical Contractors v. Commonwealth Const. Co., 801 F.2d 748, 750 (5th Cir. 1986). We review de novo the grant or denial of a motion to compel arbitration. See Webb v. Investacorp, Inc., 89 F.3d 252, 257 (5th Cir. 1996).

**II.**

We first consider whether there is a valid agreement to arbitrate between the parties. Pennzoil and Ramco are parties to five agreements containing arbitration clauses -- the Guneshli Agreement, the AMI Agreement, GUP 2, the PSC[6], and the JOA.

**A.**

We agree with the district court that the arbitration clauses in the Guneshli Agreement and GUP 2 do not apply to disputes between Pennzoil and Ramco. The Guneshli Agreement provides that "Party means either Pennzoil/Ramco or KMNG as applicable." Throughout the agreement, Pennzoil and Ramco are collectively referred to as "Pennzoil/Ramco." Similarly, in GUP 2, Pennzoil and Ramco are collectively referred to as the "Pennzoil Group," and the agreement was entered into between SOCAR and Pennzoil "on behalf of itself and Ramco." The arbitration clauses in these agreements do not apply to disputes between Ramco and Pennzoil, but rather apply to disputes between Pennzoil/Ramco, as a single party on the one hand, and either KMNG or its successor SOCAR, on the other hand. Accordingly, Ramco cannot be forced to arbitrate the dispute under either the Guneshli Agreement or GUP 2.

**B.**

Ramco also argues that the AMI's arbitration clause does not apply

---

[6]Pennzoil does not argue that arbitration is mandated under the PSC.

to disputes between Ramco and Pennzoil because Ramco and Pennzoil are a single party to the AMI Agreement. In support of this argument, Ramco points to the fact that Pennzoil/Ramco together are awarded an undivided seventeen percent "Participating Interest" in the total rights and obligations the parties may acquire in the AMI area.

Many rights and obligations set forth in the AMI Agreement are calculated based upon the parties' "Participating Interests." For example, Article 2.2 states that "the proposals and negotiating positions to be put forward shall be those which receive the affirmative vote of the Parties ... with each Party having a voting interest equal to its Participating Interest." Article 3.1 states that any costs incurred by a party pursuant to the voting procedures in Article 2.2 "shall be borne by the Parties pro rata to their respective Participating Interests." Ramco argues that the AMI Agreement proves that "Party" necessarily means the individual companies or groups of companies who were awarded Participating Interests. Because Ramco and Pennzoil are provided an undivided Participating Interest, Ramco argues they are a single party to the contract.

That Ramco and Pennzoil are allocated an undivided participating interest in the AMI Agreement does not establish that Ramco and Pennzoil are a single party to the agreement. The AMI Agreement commences by stating, "This Agreement is made ... between:" and then identifies eight separate corporate entities, including Ramco and Pennzoil. Immediately following the listing, the AMI Agreement states that the entities are "hereinafter collectively referred to as the 'Parties' and individually as 'Party.'" At the end of the document, a Pennzoil representative signed "on behalf of Pennzoil" and a Ramco representative signed "on

behalf of Ramco."  The terms of the AMI agreement do not support Ramco's position.

Other evidence in the record lends support to our view that Pennzoil and Ramco are separate parties to the contract.[7]  In a February 10, 1994, fax transmission to Pennzoil, Ramco states, "There appears to be some confusion as to whether Ramco should be circulated directly.... Let me please clarify: Ramco is a separate party to the AMI and will be a separate signature to the PSC and therefore should be included in each of your circulation lists...."  We conclude that the arbitration clause in the AMI Agreement is a valid agreement to arbitrate disputes between Pennzoil and Ramco.

## C.

The fourth agreement which contains an arbitration clause is the Joint Operating Agreement.  Ramco does not dispute the validity of the JOA's arbitration clause or that Ramco and Pennzoil are separate parties to the agreement.  Instead, it argues that the dispute does not fall within the scope of this agreement.

Having concluded that the AMI Agreement and the JOA contain valid agreements to arbitrate between the parties, we turn to whether the dispute before us comes within the scope of either of these agreements.

## III.

Whether the dispute falls within the arbitration agreement is a

---

[7]Two other parties to the AMI Agreement, "BP" and "Statoil," were also allocated an "undivided participating interest" in potential development rights in the AMI Area.  Like Pennzoil and Ramco, BP and Statoil were also individually listed and signed separately. Following Ramco's rationale, BP and Statoil must also be a singular party to the Agreement, a reading which seems to contradict Article 4.1(b) which specifically allows BP to nominate a person to fill the most senior position in the to-be-formed Joint Operating Entity.

determination this court must make, and both parties urge that we do so. We have stated in <u>Executone Information Systems v. Davis</u>, 26 F.3d 1314, 1321 (5th Cir. 1994), that the question of whether a party can be compelled to arbitrate, as well as the question of what issues a party can be compelled to arbitrate, is an issue for the court rather than the arbitrator to decide. We are satisfied that <u>AT & T Technologies Inc. v. Communications Workers</u>, 475 U.S. 643, 649 (1986), makes this abundantly clear.[8] <u>See</u> <u>also</u> <u>Litton Financial Printing Div. v. National Labor Relations Bd</u>, 501 U.S. 190, 208, 209 (1991).

This dispute centers around the December 3, 1994 "Payment Agreement for Costs Related to the Guneshli and Neft Dashlary Gas Utilization Project" entered into by Pennzoil and SOCAR which, among other things, awards Pennzoil a thirty percent equity interest in the Karabakh Prospect.

Ramco argues that the June 7, 1993 letter agreement is the "joint venture agreement" defining the terms of Pennzoil and Ramco's relationship. Ramco explains that because Pennzoil obtained the Karabakh interest as reimbursement for GUP-related expenditures it is necessarily a joint asset governed by the June 7, 1993 joint venture agreement. Furthermore, Ramco argues that the Karabakh Prospect is within the "Contract Area" as defined in the June 7, 1993 letter agreement, and, therefore, the June 7 letter agreement governs.

---

[8]We recognize that some of our decision might be read to the contrary, see <u>Sedco, Inc. v. Petroleos Mexicanos Mexican National Oil Co.</u>, 767 F.2d 1140, 1150 (5th Cir. 1985); and <u>Hornbeck Offshore (1984) Corp. v. Coastal Carriers Corp.</u>, 981 F.2d 752, 754-55 (5th Cir. 1993). Should a claim arise that might require that we determine whether there is a conflict between our decisions and to what extent, we will decide the issue at that time.

Finally, Ramco argues that the Karabakh Prospect is not a part of the Guneshli, Chirag, or Azeri Fields, and thus, the AMI Agreement and the JOA, which are limited to those fields, are irrelevant to the dispute.

Pennzoil does not dispute that the Karabakh Prospect is outside the geographic area covered by the JOA and the AMI Agreement, or that Ramco has not based its claim on either of these agreements. Rather, Pennzoil argues that Pennzoil and Ramco's relationship is confined to the fields of the Apsheron Trend, that the JOA is the controlling document regulating those rights, and that the June 7 letter merely governs the financing of Pennzoil's and Ramco's rights in the Apsheron Trend.

We emphasize that our sole responsibility is to determine whether this dispute is governed by an arbitration clause, not to determine the merits of the dispute. See Snap-On Tools Corp., v. Mason, 18 F.3d 1261, 1267 (5th Cir. 1994). "We resolve doubts concerning the scope of coverage of an arbitration clause in favor of arbitration. ...[A]rbitration should not be denied 'unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation which would cover the dispute at issue.'" Neal, 918 F.2d at 37 (internal citations omitted). See also AT&T Technologies, 475 U.S. at 650.

### A.

We first examine whether the dispute falls within the scope of the JOA's arbitration clause, which mandates arbitration of "[a]ny dispute, controversy or claim arising out of or in relation to or in connection with this Agreement or the operations carried out under this Agreement, including without limitation any dispute as to the validity, interpretation, enforceability or breach of this Agreement."

-12-

Both the Supreme Court and this court have characterized similar arbitration clauses as broad arbitration clauses capable of expansive reach.  See Prima Paint Corp., v. Flood & Conklin Mfg. Co., 388 U.S. 395, 397-98 (1967) (labelling as "broad" a clause requiring arbitration of "[a]ny controversy or claim arising out of or relating to this Agreement"); Nauru Phosphate Royalties, Inc. v. Drago Dais Interests, Inc., 1998 WL 145363, *4 (5th Cir. 1998) (holding that when parties agree to an arbitration clause governing "[a]ny dispute ... arising out of or in connection with or relating to this Agreement," they "intend the clause to reach all aspects of the relationship.").

Furthermore, courts distinguish "narrow" arbitration clauses that only require arbitration of disputes "arising out of" the contract from broad arbitration clauses governing disputes that "relate to" or "are connected with" the contract.  See, e.g., Tracer Research Corp. v. National Envtl. Svcs. Co., 42 F.3d 1292, 1295 (9th Cir. 1994) (comparing "relating to" language with "arising out of" language).  The Joint Operating Agreement uses not only the phrase "arising out of," but also "in connection with or relating to."  This resolves any doubt that this is a "broad" clause.  Broad arbitration clauses, like the JOA's arbitration clause, are not limited to claims that literally "arise under the contract," but rather embrace all disputes between the parties having a significant relationship to the contract regardless of the label attached to the dispute.[9]  See J.J. Ryan & Sons v. Rhone Poulenc Textile, 863 F.2d 315, 321 (4th Cir. 1988); Miller v. Flume, 1998 WL

---

[9]We realize that even broad clauses have their limits.  Because we are concerned only with the dispute before us and its connection with or relation to the several agreements before us, we need not explore these outer limits.

-13-

128443, *7 (7th Cir. 1998).

Ramco argues that this dispute is not arbitrable under the JOA because Ramco has not based its claim to an interest in the Karabakh Prospect pursuant to the JOA, but rather has based its claim under the June 7, 1993 letter agreement.

The fact that Ramco's claim is based on the June 7 letter agreement does not decide whether the dispute is arbitrable under the JOA's arbitration provision. See Neal, 918 F.2d at 37; American Recovery Corp. v. Computerized Thermal Imaging, 96 F.3d 88, 93 (4th Cir. 1996); ARW Exploration Corp. v. Aguire, 45 F.3d 1455, 1461 (10th Cir. 1995)(While agreement did not contain an arbitration clause, arbitration provision in other agreements broad enough to encompass dispute).

Pursuant to the JOA's arbitration clause, "any" dispute arising out of "or in relation to" or "in connection with" the JOA shall be settled by arbitration. Therefore, it is not necessary that the dispute arise out of the JOA to be arbitrable -- but only that the dispute "relate to" or be "connected with" the JOA. See Commerce Park; 729 F.2d at 339, n.4. With such a broad arbitration clause, it is only necessary that the dispute "touch" matters covered by the JOA to be arbitrable. See Mitsubishi, 473 U.S. at 625 n.14; Commerce Park, 729 F.2d at 339 n.4.

Bearing in mind the strong federal policy in favor of arbitration, we conclude the dispute is "related to" the JOA and is therefore arbitrable under its extremely broad arbitration provision. The dispute flows from a series of interrelated agreements, all of which center around the overriding goal of acquiring development rights from the Azerbaijan government in the Guneshli Field, before unitization, and the

-14-

Guneshli, Chirag, and Azeri Fields after unitization.  In addition to being related to the same overriding goal, the agreements themselves evidence their inter-relationship.  The first agreement entered into by Ramco and Pennzoil, the February 13, 1992 Letter of Intent, recites:

> During the Study period the parties expect to commence commercial negotiations with the appropriate Azerbaijani authorities relating to the [Guneshli] and [Chirag] Fields. During this time the parties will also use their best endeavors to conclude a joint operating agreement ('JOA') governing their mutual relationship. When executed, the JOA will supersede this letter agreement.

The August 18, 1992 letter agreement refers to the February 13 Letter of Intent, the feasibility study relating to the development of the Guneshli Field, and a proposed contract currently under draft and discussion (the "PEC") which was to be entered into by the Azerbaijan government, Ramco, and Pennzoil relating to the development of the Guneshli Field.  This letter acknowledged, as did the February 13 Letter of Intent, that it did not set out all details governing the parties' relationship.

Like the two preceding letter agreements, the June 7, 1993 letter agreement also acknowledged that it did not set out all the details governing the parties' relationship.  Pennzoil and Ramco agreed that, as soon as SOCAR awarded a percentage interest in respect to the unitization of the three fields, they would negotiate a more definitive agreement, but in the interim, the June 7 letter agreement controlled.  Similarly, the AMI Agreement also contemplated that the parties would conclude a joint operating agreement governing operations in the AMI Area.  The AMI Agreement also specifically refers to Pennzoil and Ramco's costs incurred in performing the gas utilization project and contains detailed provisions for allocation of and responsibility for

-15-

these costs by the parties.

GUP 2 specifically refers to GUP 1 and the concurrent General Agreement and recognizes that the primary inducement for Ramco and Pennzoil committing to those agreements was SOCAR's commitment to grant Ramco and Pennzoil exclusive development rights in the Guneshli Field. The PSC recognizes that SOCAR and the Pennzoil Group (Pennzoil and Ramco) had previously entered into the GUP 1 and GUP 2 agreements, and provides for reimbursement of Pennzoil and Ramco's costs incurred in connection with the Gas Utilization Project. In addition, the PSC specifically states that the Pennzoil Group and SOCAR can amend or modify the Gas Utilization Agreement and negotiate one or more methods for SOCAR to satisfy its obligations to the Pennzoil Group under the Gas Utilization Agreement.

The JOA is directly tied to the PSC as its purpose is to regulate the parties in the exercise of their rights with regard to the Azeri, Chirag, and Guneshli Fields. The JOA provides that the Agreement is the entire agreement of the Parties in relation to the matters dealt with therein and supersedes all prior understandings, agreements and negotiations of the Parties relating hereto. The agreements, by their terms, plainly show their interrelation.[10]

---

[10]Furthermore, there is evidence that Ramco recognized this interrelationship among the documents in a December 8, 1993, letter accompanying a draft financing agreement. Ramco's attorney states:

> I undertook to send . . . an outline of the financing agreement which will need to be put in place between Pennzoil and Ramco, the final terms which will, of course, depend on the final form of the JOA. A draft follows which will look quite similar to a version I provided [Pennzoil] earlier this year in the context of the Gunashli JOA. . . . I would like to have your preliminary observations on the outline primarily to identify any significant areas which have been omitted. The draft

We need not decide whether these letter agreements were in fact superseded by the JOA to determine the issue before us. We merely use this language from the Joint Operating Agreement as further illustration of the interrelatedness and interdependency of the numerous agreements entered into by Ramco and Pennzoil - particularly the June 7 agreement and the JOA.

Ramco is essentially disputing the terms of the December 3, 1994 Payment Agreement entered into between Ramco and Pennzoil. The Payment Agreement, entered into to satisfy GUP 2, specifically provides that SOCAR will satisfy a portion of its obligation by crediting "Pennzoil's share of the bonus payable under Article 29.2 (i) of the [PSC]." The parties entered into the JOA to "define their respective rights and obligations with respect to their operations under the PSC." Thus, this dispute, which clearly relates to the Payment Agreement, also "relates to" the JOA.

Although Ramco is relying on the June 7, 1993, letter agreement, both the June 7 letter agreement and the JOA specifically deal with the acquisition of development rights from the Azerbaijan Government in the Guneshli, Chirag, and Azeri Fields. This dispute relates to Ramco and Pennzoil's agreements entered to secure those development rights from the Azerbaijan Government, of which the Gas Utilization Project was a key factor.

Pennzoil and Ramco entered into GUP 1 and the General Agreement to

financing agreement stated: "This agreement and the Joint Operating Agreement supersede in all respects those certain Letter Agreements between [Pennzoil] and Ramco dated 13 February 1992, 18 August 1992, and 10 June 1993 respectively."

-17-

secure exclusive development rights in the Guneshli Field.  Because of SOCAR's decision to unitize the Guneshli, Chirag, and Azeri Fields, this did not happen.[11]  Therefore, Ramco and Pennzoil entered into GUP 2 with SOCAR to provide for reimbursement of GUP related costs.  SOCAR's payment to Pennzoil to satisfy GUP 2 is at the center of this dispute.

Although the dispute may not "arise under" the JOA, the dispute "relates to" the JOA and therefore falls within the JOA's broad arbitration provision.

**B.**

Like the JOA, the AMI Agreement contains a broad arbitration clause.  The AMI Agreement mandates arbitration of "any dispute or difference arising out of or in connection with this Agreement."

The AMI Agreement, like the JOA, is another agreement in the line of agreements dealing with the acquisition of development rights in the Guneshli, Chirag, and Azeri Fields.  SOCAR's decision to unitize the three fields led the companies that had previously been negotiating with SOCAR for development rights in those fields to enter the AMI Agreement. The AMI Agreement specifically divides the rights and obligations which may be acquired by the parties in the event the parties reach an agreement with SOCAR for development rights in the Guneshli, Chirag, and Azeri Fields.  Furthermore, the AMI Agreement recognizes that Pennzoil and Ramco incurred costs in performing under GUP 1 and sets forth how those costs will be borne by the parties if an agreement for development rights with SOCAR includes the Guneshli Field.  Ramco is now attempting to establish rights arising from the Gas Utilization Project and the

---

[11]SOCAR's decision to unitize also led to Ramco and Pennzoil executing the June 7, 1993 letter agreement, and eventually the JOA.

-18-

June 7 letter agreement which covers the same unitized fields the AMI Agreement regulates. Much of our discussion of the JOA above, and of governing legal principles, is equally applicable to the AMI. Like the JOA, Ramco's claim is connected to the AMI Agreement and therefore the dispute falls within the AMI Agreement's broad arbitration clause.

## CONCLUSION

For the reasons stated above, we conclude (1) that both the AMI Agreement and the JOA contain valid agreements to arbitrate disputes between Ramco and Pennzoil; and (2) that the dispute falls within the scope of the AMI Agreement's arbitration clause and the JOA's arbitration clause. Accordingly, we affirm the district court's order granting Pennzoil's motion to compel arbitration in New York, New York in accordance with the Arbitration Rules of the United Nations Commission on International Trade law.